IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARK STANG and STUART COHN, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNION FOR REFORM JUDAISM, | ) | |
| JONAH DOV PESNER, and | ) | JURY DEMAND |
| RICHARD "RICK" JACOBS, | ) | |
| | ) | |
| Defendants. | ) | |

COMPLAINT

Plaintiffs, Mark Stang and Stuart Cohn, by and through their undersigned counsel, Mark A. Stang, for their complaint against the Defendants, the Union for Reform Judaism ("the URJ"), Jonah Dov Pesner ("Pesner"), and Richard "Rick" Jacobs ("Jacobs"), state as follows:

Nature of the Action

1.      This action arises out of Defendant Pesner's libel of American Jews, including by imputation the Plaintiffs in this action, as (i) "racists" who are purportedly bigoted against African-Americans, in Plaintiffs' "hearts," "communities," "congregations," and "synagogues," and (ii) knowing and willing recipients of numerous benefits of "**white privilege**," including, but not limited to, purported special continuing benefits of how "white Jewish grandparents . . . gained entry to this country," "the places [white Jews] were allowed to live and work, to access to education and financial capital," whereby "**white Jews have reaped the rewards of racism**," all to the purported severe and lasting detriment of African-Americans.

2.      Pesner's aforementioned libelous statements were contained in an article authored by Pesner, and approved by Defendants URJ and Jacobs, published on December

10, 2019 in the *Chicago Tribune* (the "*Tribune*"). (A copy of Pesner's 12/10/19 libelous article, entitled "As Reform Jews, we must consider reparations for American slavery," is attached hereto as Exhibit **A**, and incorporated herein as though fully set forth.)

3.     The Pesner article's publication, with the cooperation of at least one *Tribune* editor, Editor X (whose identity will be ascertained through discovery) of the *Chicago Tribune*, was timed to coincide with the URJ's biennial conference held in Chicago the week of December 9, 2019.

4.     On Friday, December 13, 2019, three days after the *Tribune* published the Pesner article, the URJ's general assembly passed a resolution described by the speaker of the assembly who made the motion for adoption simply as "the resolution for reparations for slavery and systemic discrimination," to be required of all white Jews, regardless of whether said white Jews' ancestors were American slaveholders or immigrated to the United States from Europe decades after the defeat of the Confederacy and the abolition of slavery in 1865.[1]

5.     During or shortly after the URJ's December 2019 biennial conference in Chicago, the URJ posted the libelous Pesner article on its public website, where it remains to this day.

6.     The gravest period of Jew-hatred in world history consisted of the advent, rise, and fall of the Nazi Party in Germany, from 1919 to 1945. The road to the Nazis' mass-murder of six million Jews (comprising more than half the Jews of Europe and one-third of all the Jews in the world) in less than six years was first paved with an insidious foundation of group defamation, including blood libels and organized boycotts against the Jews. However, never in the darkest hours of the Nazi era did people claiming to be Jews, like the individual Defendants, Jacobs and Pesner, so unhesitatingly and publicly libel and vilify the Jewish people.

---

[1] The entire process of the URJ assembly's consideration and passage of its reparations resolution, by voice vote with a smattering of "nays" and "abstentions," lasted a total of 34 seconds. Not a single member responded to the Speaker's invitation for "discussion." (See video posted by the URJ's Religious Action Center on its Twitter account: https://twitter.com/TheRAC/status/1205533111087489024?s=09.)

7.     It is no wonder then that the Defendants have closely allied themselves with "activist" Al Sharpton, the only African-American "leader" in U.S. history to have incited a bloody pogrom against American Jews on U.S. soil, in Crown Heights, Brooklyn, New York in 1991. Immediately following the death of a seven-year old black child in a pedestrian-auto accident, and a mob's chase and stabbing murder of Yankel Rosenbaum, a defenseless young Australian Jewish student, on information and belief, Sharpton reportedly denigrated the Jews of Crown Heights as "diamond merchants" guilty of "apartheid," and has also castigated Jews as "Jew bastards" and "bloodsucking jews," among his other Jew-hating slurs.

8.     Sharpton led a mob march through Crown Heights in which his followers repeatedly shouted, "Death to the Jews!" See https://en.wikipedia.org/wiki/Crown_Heights_riot and https://hamodia.com/2014/08/20/bitter-truth-crown-heights-pogrom/ (For all of his hate speech against the Jewish people, even Chicago's own Louis Farrakhan has not managed to incite a violent pogrom immediately following a mob's murder of a Jew, like Defendants' friend and ally, Sharpton.)

9.     Sharpton, one of the leading proponents of slavery reparations in the United States, with the support of the Defendants, has never even apologized, let alone paid or offered payment of damages or reparations, for his singular leading role in inciting the Crown Heights Pogrom. (A tweet-photo of Defendants Jacobs and Pesner, enjoying Sharpton's company, from Sharpton's twitter account, is attached as Exhibit **B**.)

10.     People can differ strenuously about and debate the legality, morality, and feasibility of imposing slavery reparations on people who never owned slaves (and never had ancestors who owned slaves) for the benefit of persons who were never personally enslaved, 155 years after the abolition of slavery in the United States -- an abolition accomplished by the United States government through a cataclysmic Civil War, at a human cost of more than 360,000 deaths in the

Union Army and Navy (including tens of thousands of African-American Union troops at Ft. Wagner, South Carolina and in other battles). Those issues and that debate are not the subject of this action. But nothing justifies any proponent or opponent of slavery reparations committing group libel against an identifiable racial, ethnic, or religious group, necessarily imputed to each of the group's members, in perceived furtherance of their advocacy about the issue.

11. In his "I have a dream" speech, given on the National Mall in 1963, Dr. Martin Luther King, the greatest civil rights advocate of the 20th Century, assassinated on June 4, 1968, urged all Americans to join together to form a society whose members judge each other by the "content of their character" rather than the "color of their skin." Despite labeling themselves "progressives," Defendants have abandoned these exhortatory watchwords of Dr. King.

12. Unfortunately, Dr. King's watchwords have been abandoned by many self-interested pretenders who have laid false claim to Dr. King's civil rights mantle. Inexplicably, "progressive" politicians and "religious leaders" prefer to curry favor with an unapologetic Jew-hater, such as Al Sharpton, rather than publicly ally themselves with a genuine civil rights leader like the Rev. Jesse Jackson, a true disciple of Dr. King who but for fate would have been martyred with him in Memphis.

13. In a shocking affront to and subversion of Dr. King's dream, Defendants have seized upon (i) an immutable biological characteristic, white (melanin-lacking) skin color, and (ii) largely culturally inherited membership in the world's oldest organized monotheistic religion, Judaism (dating back to the first Patriarch, Abraham, who rejected idol worship in Ur, Mesopotamia, in present-day Iraq, in 1800 B.C.E.), as two-fold indicia of bigotry and evil on the part of an identifiable group, white Jewish Americans, and its members, including Plaintiffs.

14. Defendants are attempting to foist upon white American Jews the libelous presumption that they should all be deemed racists and culpable recipients of "white privilege."

Defendants libel American Jews with knowingly "reap[ing] the rewards of racism," rewards that Defendants insinuate that American Jews have misappropriated from African-Americans, regardless of the personal backgrounds and character of individual Jews. Defendants are promulgating those hateful libels against all American Jews to the entire world.

15.     Contrary to Defendants' self-righteous moral preening, their libelous pronouncements are not a formulation for racial justice and harmony in America, but rather a catalyst for racial divisiveness and ethnic hatred and violence directed toward American Jews. Indeed, such violence has already ensued, with the attempted murder of five Jews, attending a Chanukah celebration in a rabbi's home, by machete attack in New York, close on the heels of Defendants' December 10, 2019 published libel of racism and exploitation against Jewish Americans.

Parties

16.     Plaintiff Mark Stang ('Mark") is a citizen of the State of Illinois.

17.     Plaintiff Stuart Cohn ("Stuart") is a citizen of the State of Illinois.

18.     Defendant Pesner is, on information and belief, a citizen of the State of New York.

19.     Defendant Jacobs is, on information and belief, a citizen of the State of New York.

20.     Defendant URJ is a not-for-profit corporation organized under the laws of the State of Ohio with its administrative headquarters in New York, New York.

21.     Jacobs is, and at all relevant times was, the President of the URJ, and an agent and employee of the URJ. Pesner is, and at all relevant times was, the Senior Vice President of the URJ, and an agent and employee of the URJ. In publishing their libels against American Jews, including the Plaintiffs, Jacobs and Pesner were acting within the scope of their office, agency and employment, by the URJ, which also approved and ratified their libels. As a result, the URJ is, at

a minimum, liable in *respondeat superior* for the libels in the Pesner article, which have now been perpetuated on the URJ's public website.

### Jurisdiction and Venue

22.     This Court has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332, as the plaintiffs and the defendants are citizens of different states, respectively, and the matter in controversy exceeds the value of $75,000.

23.     This Court has jurisdiction over the Defendants pursuant to 735 ILCS 5/2-209, and venue is proper in this District pursuant to 28 U.S.C. §1391(b)(1) and (2) because: (i) the Defendants first published their libels solely in the *Chicago Tribune*, a newspaper of general circulation in the State of Illinois, and in no other newspaper anywhere else in the United States; and (ii) Defendants deliberately timed the publication of the libels to coincide with the biennial meeting of the URJ in Chicago, when Defendants Jacobs and Pesner, individually and as officers of URJ, and thousands of members of the URJ's General Assembly, were physically present in the State of Illinois.

24.     The United States District Court for the Northern District of Illinois is the most convenient forum for this action, because numerous third-party witnesses, with knowledge of the Pesner/Jacobs/URJ libels and the deliberately timed circumstances of their publication, including (i) *Tribune* Editor X, (ii) *Tribune* publisher and editor-in-chief Bruce Dold, and (iii) the *Chicago Tribune* editorial board, all reside and work in the State of Illinois.

### FACTS

Mark Stang's Ancestors, 20th Century Immigrants from Europe to America,
Had Nothing to Do with 19th Century American Slavery, Racism, or "White Privilege."

25.     Mark's maternal grandparents, then 22-year old Harry Cohen and 17-year old Rose Ruckel, emigrated to the United States from White Russia (present-day Belarus) in 1905 and from Austria in 1907 respectively, marrying in 1908.  Harry sought to avoid conscription into Czar

Nicholas II's army in the Russo-Japanese War and a mandatory military term of service of 25 years. Rose's older brother Wilhelm ("Willie"), Mark's great uncle, served in the Austrian army in World War I, was captured by American troops, and held in a POW camp in New Jersey. Rose's written appeals to President Woodrow Wilson to visit her brother there were declined. Willie was repatriated to Austria after the war and perished in the Holocaust, never having seen his sister again since 1907.

26.     Mark's mother, Mildred Stang, nee Cohen, was born in Paterson, New Jersey in 1916. Mark was born in Neptune, New Jersey in 1952. Mildred, twice-widowed (*first* as a war bride, with her first husband, a Jewish enlisted Army soldier from the Bronx, having been killed in Operation Torch, the November 1942 Allied invasion of North Africa, and *second* as a farm wife), spent most of her adult life working as a bookkeeper and raising her two sons.

27.     Mark's paternal grandparents, Moshe Stang and Toby Stang, born in Poland in 1870 and 1869 respectively, were murdered by Nazi SS death squads in Cracow Province, Poland, in 1941.

28.     Mark's father, Eliasz Stang, was born in Cracow Province, Poland in 1900, one of 11 children born to Moshe and Toby Stang. Eliasz Stang served in the Polish army in the early 1920's. Thereafter, Eliasz moved to Essen in Weimar Germany, where he (now using the more Germanic first name Erich) and another brother, Otto, founded a small company that specialized in the manufacture of burlap bags and waterproof automobile and boat covers. The Stang brothers' small company was expropriated by the Nazi government in 1935, but fortunately for the Stang brothers the new Aryan owners retained them as salaried managers of the company.

29.     During their more than five years of residence in Nazi Germany, the Stang brothers and their families endured constant humiliations, large and small, and ever increasing deprivations of their human rights. For example, blonde-haired Erich was once taunted by a Hitler Youth, the

son of one the new Aryan owners of his expropriated company, for "hiding your horns." Erich's daughter (Mark's late, older half-sister) Bettie, at ages six and seven, was ordered by her teachers as a matter of Nazi school policy to sit alone every day in a back corner of the classroom, the "Jew corner," and wear a dunce cap labeled "Jew."

30.    The Stangs, like all Jews in Germany, were completely barred from public areas, including restaurants, theaters, parks, and beaches, with every German city, town, and village having signs posted with "Jews Not Welcome Here," "No Dogs or Jews Allowed," "The Jews are our Misfortune," and "Don't Buy from Jews," among other hateful slogans. The Nazi government ordered the temporary removal of these Jew-hating signs during the 1936 Berlin Olympics.[2]

31.    In January 1938, the Stang brothers inadvertently failed to stop work at their factory when Fuhrer Adolf Hitler was giving a daytime speech broadcast over the German national radio, to be piped in over loudspeakers in workplaces. Such stoppages were required of all workplaces other than armaments factories. One of the Aryan employees reported the Stang brothers' accidental transgression to the Essen office of the Gestapo, whose agents quickly arrived at the factory with a squad of brown-shirts. The Gestapo agents and brown-shirts assembled the Aryan workers in two lines so as to watch them beat up their Jewish plant managers in the middle of the access road to the factory.

32.    After being beaten up by the Nazis, Erich and Otto swiftly decided to leave Nazi Germany with their young families for the United States as soon as possible. They refused the entreaties of their parents and nine siblings in Poland to return to live in their home country with their extended family.

---

[2] African-American track stars Jesse Owens won four gold medals and Ralph Metcalfe one gold and one silver medal at the 1936 Olympics, disproving the myth of Aryan superiority right in front of spectator Adolf Hitler. Jewish American track athletes Marty Glickman and Sam Stoller were in Berlin but prohibited from competing in the Games at the last minute by American Olympic Committee head Avery Brundage.

33. Fortunately for the Stang brothers, they had never sought German citizenship (of which all German Jews were stripped by the 1935 Nuremberg race laws). Their retention of Polish citizenship enabled them to lawfully emigrate as legal resident aliens of Nazi Germany to the United States in March, 1938 (seven months before *Kristallnacht*), as the U.S. immigration quotas for Poland had not yet been filled, in contrast to the quotas for German immigration that had been filled by desperate stateless German Jews in the first week of 1938. (A copy of an excerpt of Eliasz Stang's Polish passport, devoid of the large red "J" stamped on passports of German Jews, but including pages with Nazi eagle stamps, is attached hereto as Exhibit **C**.)

34. In June 1938, having Americanized his first name, Eric Stang purchased a 14 acre tract of land on Squankum Road north of Lakewood, New Jersey, where he eventually built a home and a chicken farm, where Mark was raised until age seven in 1960.

35. During the Second World War, all but one of the more than 30 members of the Stang family in Poland, consisting of parents Moshe and Toby Stang, eight of their children and their spouses, and several infant or toddler grand-children, were murdered, either by being shot to death by Nazi death squads or asphyxiated by Zyklon B insecticide gas in gas chambers in Nazi extermination centers in Poland, with their corpses burned in crematoria, and their ashes dumped in rivers and ponds or buried in unmarked mass graves.

36. The sole Stang family survivor of the German Nazi Holocaust, Mark's uncle, Felix Stang, witnessed his wife and three year old daughter (Mark's first cousin) being pistol-shot in the head in the town square of his Polish village by Nazi troops, as he gathered firewood on a hillside overlooking the square. Felix fled into the forest, with just the clothes on his back, where he eventually found and joined a band of Jewish partisans. Felix survived the war, married a survivor in a displaced persons camp, and then immigrated to Sydney, Australia in 1946, where he became

a chicken farmer and raised two sons.  Felix, the last surviving member of the Stang family of

Krawkow Province, Poland, died in 1970 at age 63.

Contrary to Pesner's Article's Assertions, the Stang Family's Home
 and Workplaces Had Nothing to Do with "White Privilege"

37.     Eric Stang and his brother Otto Stang died at age 56 in 1957 and age 61 in 1958,

respectively.  Thereafter, Eric's widow, Mildred, struggled to manage the Squankum Road chicken

farm for four years.  After one severe winter trapped on the farm, Mildred decided in 1961 to move

with her young sons to Miami Beach, Florida, where the family lived in a four-flat building.  Their

neighbors consisted of two Auschwitz survivors (the landlords), with numbers tattooed on their

forearms, a young family of recent Cuban Jewish refugees, and a young family from New York

City.

38.     The small apartment in which Mark grew up for ten years until leaving for college

had window unit air conditioners solely in the living room and his mother's bedroom.  Mark

learned to sleep in the nude with an electric fan to cope with the Florida heat and humidity. There

was no dish-washing machine – Mark and his younger brother were alternately the dishwashers

and dish driers.  The four-flat had only a single exterior clothes-washing machine, in a small

attached shed, and clotheslines.

39.     Mark and his younger brother each had his own bed, but shared a desk, which they

used alternately to do their homework. The competition for the desk lessened when Mark went to

work in 1968 at age 15 as a clean-up cabana boy (spending each evening alone hauling away and

storing some 500 chaise lounge mats, picking up and aggregating some 1,000 discarded towels,

sweeping the pool deck, and cleaning and chlorinating the swimming pool) at a resort hotel for

$1.00/hour, cold cash.

40.     At age 16, Mark obtained a more lucrative job as a Publix supermarket bag boy and

stock clerk for $1.625/hour (the starting union scale being 2½ cents an hour above minimum wage,

not quite offsetting the $10/mo. union dues). After Mark hurled an insult at a white store manager who had made lewd, disparaging remarks about Jewish women and girls, Mark became the sole employee tasked to soap, scrub, rinse, and squeegee the supermarket's entire concrete loading dock every Saturday.

41.     The only occasions on which Mark received presents were his Bar Mitzvah and wedding. In the Stang family, which subsisted on Social Security survivor's benefits and Mildred's sporadic bookkeeping wages, Chanukah did not remotely resemble a "Jewish Christmas."

> Contrary to Pesner's Article, Mark's Access to Education
>  Was Not Obtained Through "White Privilege."

42.     Mark has lived a life devoid of any privileges, "white Jewish" or otherwise, other than those purchased with the literal sweat of his brow in menial jobs, or, later in life, through his legal knowledge and skill derived from study and hard work. Mark attended *yeshiva* (Jewish parochial school) for six years while growing up, through a need-based full scholarship. He financed his college and law school educations largely through merit scholarships and savings from work, during which he never took a week-day off during any school vacations.

> Contrary to Pesner's Article, Mark's Access to "Financial Capital"
>  Was Not Obtained Through "White Privilege."

43.     Perhaps the most despicable of Defendants' several libels against American Jews consists of their false assertion that American Jews have benefitted from special "access to . . . financial capital," by which "white Jews have reaped the rewards of racism." This odious lie, that Jews undeservedly, through special unjustified group advantages, have enriched themselves and achieved financial superiority at the expense others less fortunate, has been a pretext for the oppression (including expropriation of money and property) and murder of Jews throughout

history, culminating in the Russian pogroms of the early 20th Century and the industrialized mass murder of the Nazi Holocaust.

44.     It is appalling that a rabbi, Defendant Pesner, ensconced in the second highest officer position of the largest organization of Reform Jews in America, would resort to the verbal equivalent of Shakespeare's Shylock, as well as the Nazis' caricatures of money-grubbing Jews in the infamous tabloid *Der Sturmer*, to impose Defendants' and Al Sharpton's political will on American Jews.

45.     Mark has never had special "access to financial capital" as part of "reap[ing] the rewards of racism." Mark never borrowed money from any financial institution until 1982 when, at age 29, he purchased a condominium apartment in Chicago for himself and his pregnant wife by taking out a five-figure, five-year adjustable mortgage from the First National Bank of Chicago (where Mark had no contacts) at a 12.9% interest rate, when 30-year rates were almost 16%. Mark has never enjoyed any special access to financial capital by virtue of being white or Jewish.

46.     Mark has never been a racist nor a bigot. There is no history of racism or bigotry in Mark's family. To the contrary, in the mid to late 1940's, when demand for poultry and eggs in America, and then liberated Europe, under the Marshall Plan, was at a peak, Eric Stang was engaged not only in managing his own chicken farm, but building chicken coops for both new and established farmers. Eric hired the best man to supervise the crews on his construction projects, an African-American man. As a probable consequence, one night Eric and his family woke up to the glare of a large cross burning on the front lawn of their New Jersey farmhouse. The perpetrators were never caught.

47.     As a young farm boy, Mark attended a suburban, integrated public elementary school in New Jersey. After completing *yeshiva* studies, Mark attended an integrated public high school in Miami, Beach, Florida. Mark also attended an integrated college at Emory University

(where he was enrolled as a cadet-sergeant in the integrated Air Force ROTC 170th Squadron) and an integrated law school at the University of Chicago. Mark has had African-American friends at every school he has ever attended.

48.    At age 15, in June 1968, two months after the assassination of Rev. Martin Luther King, Mark participated in a "Poor People's March," in 'Washington, D.C., visiting the "Resurrection City" plywood tent encampment on the National Mall.

49.    As a young lawyer, Mark served on the board of directors of the Chicago regional chapter of the Anti-Defamation League of B'nai B'rith ("the ADL"). Mark was requested by the then-executive director of the Chicago ADL to infiltrate and conduct undercover surveillance of a Chicago-based Jew-hating group, a mission that Mark, posing as a Jew-hater himself, carried out successfully and without hesitation.

50.    Mark is a trial lawyer and appellate advocate, now a sole practitioner, with a varied practice. (See, www.stang-law.com). Mark's practice has included advocacy on behalf of people of color, including, most recently, a female Muslim-American entrepreneur of Iranian/Pakistani ethnicity in business litigation before this Court, and an African-American middle-aged male nursing home worker on his employment discrimination claims before the EEOC. Mark has suffered damage, and will continue to suffer damage, to his reputation and to his law practice by Defendants' libelous statements accusing American Jews, including Mark, of being racists who have willfully benefited from "white privilege" to the detriment of African-American citizens (and, by implication, to the detriment of all people of color).

Plaintiff Cohn's Ancestors, 20th Century Immigrants from Europe to America,
Had Nothing to Do with 19th Century Slavery, Racism, or "White Privilege"

51.    Stuart's maternal grandparents, Antoinette Kirschenbaum and Abraham Stein, immigrated to the United States from Austro-Hungary and Russia, respectively, in 1905. They each moved to Rogers Park in Chicago where they met and married. Abraham operated a dry

cleaning store. Their daughter Phyllis, Stuart's mother, was born in Chicago in 1927 and later worked as an office secretary for famed Viennese Jewish psychiatrist Bruno Bettelheim, who had been a prisoner in the Dachau and Buchenwald concentration camps, before immigrating to the United States in 1939.

52. Stuart's paternal grandparents, Sadie Cohen and Harry Cohn, immigrated to the United States from Russia and Lithuania, respectively, in 1905. Harry first operated a pushcart selling coffee on the West side of Chicago. Later Harry grew the business into an entity known as Superior Coffee Company, an integrated operation that roasted green coffee beans, ground the beans, and sold coffee wholesale to restaurants and offices. Sadie and Harry's son, Sanford, Stuart's father, attended the University of Wisconsin, where he met and married fellow student Phyllis. Sanford graduated from law school, but practiced law for only two years before going to work for the family's coffee business for the rest of his life. Stuart worked for the family coffee business during high school, making sales calls and deliveries. Stuart later became a corporate lawyer in the City of Chicago.

53. Stuart is a sole practitioner with a varied practice. Stuart's practice involves representation of people of color, including handling the incorporation and ongoing legal needs of (i) a medical practice founded, owned, and operated by an African-American female physician, and (ii) a wedding and special event-planning business founded, owned, and operated by an African-American female businesswoman.

54. Stuart has suffered damage, and will continue to suffer damage, to his reputation and in his law practice by Defendants' libelous statements accusing American Jews, including Stuart, of being racists who have willfully benefited from "white privilege" to the detriment of African-American citizens (and, by implication, to the detriment of all people of color).

The Chicago *Tribune* Has Blocked All of Plaintiff's Efforts to Mitigate Their Damages from the *Tribune*'s Publication of Defendants' Group Libel against American Jews.

55.    On December 11, 2019, Mark submitted his letter to the editor for publication in the Chicago *Tribune*'s "Voice of the People," responding critically to Pesner's article of the same date. (Exhibit **D** hereto).

56.    On December 19, 2019, Stuart submitted his letter to the editor for publication in the *Tribune's* "Voice of the People," responding critically to Pesner's article. (Exhibit **E** hereto).

57.    On information and belief, the *Tribune* received at least one other letter, submitted for publication in "Voice of the People," responding critically to Pesner's article.

58.    Mark made written demand upon the vice-president and deputy general counsel of the *Tribune*'s parent company, Tribune Publishing Company  on January  8, 2020, to preserve for discovery all correspondence the *Tribune* has received that is critical of the Pesner article, specifically cautioning that the *Tribune* that  will face a spoliation of evidence claim if it fails to preserve such correspondence.

59.    The *Tribune* declined to publish Mark's and Stuart's aforementioned response letters to the Pesner article.  The *Tribune* has not published any letters to the editor responding critically to the Pesner article.

60.    However, the *Tribune* published two letters in Voice of the People supporting Pesner's position on reparations within the week following its publication of the Pesner article.

61.    The *Tribune's* first pro-reparations letter, published December 15, 2019, entitled "Germany's integrity vs. America's denial" (Exhibit **F** hereto) echoed Pesner's misleading assertion (not libelous in itself) that the government of Germany had paid Holocaust reparations to Holocaust survivors in Israel, without stating the time frame of such reparations. German reparations were in fact remitted to the State of Israel, and not to individual Holocaust survivors, pursuant to a Reparations Agreement dated September 10, 1952, between W. Germany and Israel,

(https://en.wikipedia.org/wiki/Reparations_Agreement_between_Israel_and_West_Germany),

less than eight years after V-E Day and the Nazi murders of hundreds of thousands of Hungarian

Jews in the last stage of the Holocaust, and nine years before the Eichmann trial in Jerusalem.

62.   The "Germany's integrity" letter published by the *Tribune* asserted that West

Germany's post-WWII government (which history shows consisted largely of former Nazi Party

members, except at the most senior levels) possessed greater "moral integrity" than does the

present government of the United States, in recognizing West Germany's "moral debt" to pay

reparations.

63.   The "Germany's integrity" letter, like the *Tribune* editor who approved the letter

for publication, ignored the fact that more than 360,000 Union soldiers and sailors died in the

American Civil War (https://www.nytimes.com/2012/04/03/science/civil-war-toll-up-by-20-

percent-in-new-estimate.html), culminating in the 1865 victory and abolition of slavery (in stark

contrast to the evil means and ends of the Nazi Wehrmacht, whose successful blitzkriegs were a

prerequisite to carrying out Hitler's genocidal "Final Solution to the Jewish Question.")

64.   The "Germany's integrity" letter chosen by the *Tribune* to express the "Voice of

the People" also proclaimed, without any pretense at factual foundation, the blatant anti-American

lie that "[i]n our schools, American history textbooks likewise deliberately fudge, omit, and gloss

over the naked brutality of slavery, miseducating our youths, generation after generation."

65.   The *Tribune*'s second pro-reparations (and pro-Pesner) letter, entitled "The

response to the call for reparations," published December 16, 2019 (Exhibit **G** hereto), commended

the *Tribune* for publishing Pesner's article and merely re-stated the name of the same pro-slavery

reparations advocate, Ta-Nehisi Coates, identified by Pesner in his article published five days

before. This second letter contained extensive block-quoted extracts from Coates' June 2014

*Atlantic Magazine* article, "The Case for Reparations," for which article the *Tribune* had already published a clickable hypertext link in the earlier Pesner article itself.

66.     Despite the *Tribune*'s misleading headline for the December 16, 2019 pro-reparations, pro-Pesner letter, the letter was not "*the* response," or even representative of the majority of the letters actually received by the *Tribune*, in response to Pesner's reparations call and group libel of American Jews.  As alleged below, the *Tribune*, at the direction and insistence of the *Tribune*'s Publisher/Editor-in-Chief, Bruce Dold, deliberately suppressed publication of all written submissions (even a paid political ad from Mark that would have brought in thousands of dollars in ad revenue to a newspaper that is decimating its newsroom with staff buyouts) received by, or tendered to, the *Tribune* that were contrary to the assertions in the Pesner article, both as to "slavery reparations" and Pesner's libelous attack on American Jews.

> The *Tribune*'s Publication of Mark's Other Submissions to the *Tribune* Evidences the *Tribune*'s Specific Intention to Suppress All Critical Responses to the Pesner Article.

67.     The *Tribune*'s decision to spike Mark's and Stuart's response letters had nothing to do with the quality of the writing.  Both letters were well written, supported their respective positions with facts, and would have been of compelling interest to the *Tribune*'s readership. Moreover, publication of either letter would have dispelled any misconception among the *Tribune*'s readership that none of the 250,000 Jews in metropolitan Chicago disagreed with any of Pesner's libelous assertions about Jews, and had acquiesced in the assertions.

68.     Thus, Publisher Dold's obstinate refusal to publish any submissions contradicting Pesner's libels put the *Tribune*'s Jewish readership in the Chicago metropolitan area in a false light, of having admitted to Defendants' Tribune-published libels by their deafening silence. Dold's calculated decisions and actions are unethical by any objective standard of journalistic ethics, far more unethical than the November 2019 truth-suppression actions of the inexperienced, nervous young editors of the *Daily Northwestern,* described in paragraph 72 below.

69.     The *Tribune* has published nearly all of Mark's letters to the editor submitted since 1978, when the *Tribune* published a letter from Mark, then a first-year law student at the University of Chicago, about the First Amendment issues pertinent to a proposed march of American neo-Nazis through the Village of Skokie, then home to thousands of Holocaust survivors and their families.

70.     In 2007, the *Tribune* published a humorous letter from Mark (who had served as features and humor editor of his college newspaper, the *Emory Wheel*), proposing that the Chicago Cubs (at that time having gone 99 years without winning a World Series), change their mascot name to the Chicago Cicadas (Exhibit **H** hereto).  The *Tribune* commissioned one of its illustrators to provide an accompanying cartoon of a cicada wearing a Cubs hat.

71.     In 2019, the *Tribune* published two letters from Mark in Voice of the People. Mark's first letter to the *Tribune* editor, published on June 22, 2019, critiqued columnist Mary Schmich's endorsement of a Democratic primary candidate for president.

72.     Mark's second letter to the *Tribune* editor in 2019, published on November 13, 2019, criticized the editors of the Northwestern University student newspaper, the *Daily Northwestern*, for their lack of journalistic integrity in their selective and suppressive reportage of concerted student violence at a campus event.  In fact, Mark submitted his letter about the *Daily Northwestern* with the proposed headline, "Self-Inflicted Wounds to Responsible Journalism at the Northwestern Daily" (sic), which the *Tribune* published under a harsher, more condemnatory headline of its choosing, "Northwestern Editors Were Cowardly."

73.     Three weeks after the *Tribune*'s rejection of Mark's December 11, 2019 letter responding to the Pesner article, on December 31, 2019, the *Tribune* published an Eric Zorn column containing several reader-submitted predictions (with attributions) for the next ten years, including Mark's prediction about a 25% drop in the number of U.S. lawyers by 2029.

The *Tribune*, Through Publisher Dold, Has Blocked Every Reasonable Effort
of Plaintiffs to Mitigate the Damages Sustained from Defendants' Libel.

74.     The *Tribune*'s refusal to publish Mark's letter responding to Pesner's article is conspicuous and telling in light of the *Tribune*'s long history of publishing most of Mark's other submissions. The *Tribune*'s refusal to publish Mark's letter was in furtherance of the *Pravda*-like decision and determination of Publisher/Editor-in-Chief Bruce Dold to publish only pro-Pesner letters, while flatly refusing to publish (i) any readers' letters contrary to the Pesner article, (ii) an article responding critically to the Pesner article that was written independently (of the plaintiffs herein) by one of the nation's leading professional journalists on issues of Jewish concern, as more particularly alleged in the paragraph below, or  (iii) publish a paid political ad from Mark, as alleged in paragraph 66 above.

75.     On December 26, 2019, Jonathan Tobin, founder and editor-in-chief of the Jewish News Syndicate ("JNS"), and one of the most highly respected journalists in America writing about Jewish affairs, among other matters, published an article directly responding to Pesner's article on the JNS website.  (The Tobin article may be viewed via the JNS website at the URL https://www.jns.org/opinion/reforms-embrace-of-reparations-wont-advance-justice/, but may not be saved as a .pdf, printed out, or re-printed without permission from JNS.)   Mark requested Publisher Dold and the *Tribune* editorial board in writing to publish at least the Tobin article, even if Publisher Dold was going to persist in his refusal to publish any readers' letters responding critically to Pesner's article.  The *Tribune* ignored Mark's request.

76.     Exasperated by Dold's intransigent refusal to (i) publish any letters critical in any way of the Pesner article, or any other submissions, including the Tobin article, or Mark's paid political ad, or (ii) even respond to Mark's email requests for a meeting, even if only to reject the meeting request, on January 8, 2020, Mark wrote a letter to the vice-president and deputy general

counsel of the *Tribune*'s parent corporation, Tribune Publishing Company, about the Pesner article and ensuing documents and communications to Dold and the editorial board.

77.     Soon thereafter, Mark was contacted by the *Tribune*'s Standards Editor, with whom he had a 95-minute telephone conversation on January 16, 2020. Mark provided the Standards Editor with nearly all of the information alleged in this complaint, as well as elaborating upon the harmful impacts of Defendants' libel on American Jews, including Mark and Stuart. Mark made a final offer to refrain from pleading any allegations about the *Tribune* in this complaint, other than the foundational fact that the *Tribune* had published the Pesner article on December 10, 2019, if the *Tribune* would publish *either* Mark's and Stuart's response letters *or* the Tobin article. Three days later, the Standards Editor informed Mark that *Tribune* Publisher Dold would not modify his position one iota from his absolute refusal to publish any submissions of any kind stating facts or expressing views contrary to those contained in the Pesner article.

78.     Publisher Dold, acting like an absolute Pharaoh of all that he surveys from his lofty perch atop the *Tribune*'s editorial pyramid, decided that the *Tribune* would never publish a single word challenging Pesner's libelous narrative that American Jews (including the *Tribune*'s Jewish subscribers) are thoroughgoing racist recipients of "white privilege," in their hearts, communities, synagogues, congregations, homes, workplaces, ancestors' immigration to America, and their "access to education and financial capital."

79.     Publisher Dold refused to publish a peep of opposition to Defendants' assertion that American Jews must atone for their purported racist, white-privileged sins, and can find redemption only by heeding Defendants' admonitions (in concert with the demands of Jew-hater Al Sharpton) to pay slavery reparations and support the imposition of slavery reparations on other Americans.

80.     As a result of Defendants' libels, with Plaintiffs' diligent efforts to mitigate their damages blocked by the *Tribune*'s Publisher, Bruce Dold, at every turn, Plaintiffs have sustained and will continue to sustain damages in the amount of at least $1.8 million.

81.     Punitive damages of at least $6 million are warranted against Defendants as their libels against American Jews are not only false, but knowingly false and malicious, made with (i) the intention of coercing American Jews to support Defendants' and Al Sharpton's political goals, and (ii) the foreseeable effect of fomenting racial divisiveness in the country, generally, and inciting property crimes and violent hate crimes, including murder and attempted murder, against American Jews from both the left and the right, specifically.

82.     Plaintiffs irrevocably pledge that they will donate any and all monies recovered through this action, after (i) reimbursement of their court costs and other out-of-pocket expenses, and (ii) and personal compensation not to exceed $18,000 total, to the following charities in the proportions indicated: United Negro College Fund (www.uncf.org) (1/3), American Society for Technion – Israel Institute of Technology ( www.ats.org) (1/3), and American Brain Tumor Association (www.abta.org) (1/3). All of these charities are worthy of contributions from the Defendants even without a judgment for libel.

WHEREFORE, the Plaintiffs, Mark Stang and Stuart Cohn, request that judgment be entered in their favor and against the Defendants, the Union for Reform Judaism, Jonah Dov Pesner, and Richard "Rick" Jacobs for compensatory damages in an amount, subject to proof at trial, in excess of $1.8 million, together with exemplary, punitive damages in the minimum amount of $6 million, their costs of suit incurred herein, including (without limitation) attorneys' fees, to the extent permitted by law; and for such other and further relief as the Court may deem just and proper.

<u>Plaintiffs demand trial by jury</u>.

MARK STANG and STUART COHN

By _____ s/ *Mark A. Stang* _____
           Their Attorney

Mark A. Stang
Stang-Law Firm
584 Hyacinth Place
Highland Park, Illinois  60035
(847) 432-2073