IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARK STANG and STUART COHN, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 1:20-cv-00757 |
| | ) | |
| v. | ) | Judge Matthew F. Kennelly |
| | ) | |
| UNION FOR REFORM JUDAISM, | ) | Magistrate Judge M. David Weisman |
| JONAH DOV PESNER, and | ) | |
| RICHARD "RICK" JACOBS, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR RULE 12(b)(6) MOTION TO DISMISS

Defendants UNION FOR REFORM JUDAISM, JONAH DEV PESNER, and

RICHARD "RICK" JACOBS, by their attorney Mitchell H. Frazen of LITCHFIELD CAVO

LLP, for their Memorandum of Law in support of their Motion to Dismiss Plaintiffs'

Complaint pursuant to Fed. R. Civ. P. 12(b)(6), state as follows:

### I.     INTRODUCTION

On December 10, 2019, Rabbi Jonah Pesner of the Union for Reform Judaism

submitted to the *Chicago Tribune* an article entitled "As Reform Jews, we must consider

reparations for American slavery." The original editorial, published on the "Perspective"

page of the *Tribune* (Exhibit A), and thereafter republished there with "Commentary"

added to its title (Exhibit B), and on the URJ web page with "Op-Ed" added to its title

(Exhibit C), included the following language:

> "Americans in general and faith groups in particular increasingly find ourselves
> reckoning with our nation's bigoted history and struggling with how to dismantle
> the racist systems and structures that persist to this day."

"African slaves and their descendants had their freedom, self-determination, bodies, communities, ability to inherit and pass down wealth to their loved ones, possessions and, most important, their humanity, systematically stolen from them; reparations are an attempt to offer a restoration of their rightful blessings."

"We find ourselves in an era of reckoning, of cultural shifts, the rejection of a racist history and of ongoing racist systems and structures. Confederate statues are coming down, grandchildren are educating their elders about white privilege and universities are moving to atone for their roles in perpetuating our democracy's original sins of slavery and colonization."

"And without diminishing their sacrifices or the challenges they faced, we can now understand that they and many of us also benefited from, and continue to benefit from, the same white privilege that allows for the continued discrimination against black Americans. From how we gained entry into this country to the places we were allowed to live and work, to access to education and financial capital, white Jews have reaped the rewards of racism. What do we as white Jews do when we realize that so many of us have benefited from whiteness – even as we still have faced discrimination of our own?"

"Knowledge must then transform into action against the racism still lingering in our congregations and communities, and a clearer sense of what true reparations might look like."

"The URJ's resolution is about confronting racism in our county, our synagogues and hearts."

The URJ biennial meeting, the largest assembly of American Jews, included 850 member congregations, representing over 1.5 million persons. https://www.2018annualreport.urj.org/congregational-life. The resolution adopted at the 2019 URJ meeting called only for a study of reparations for slavery.

## II.   **FACTUAL ALLEGATIONS OF PLAINTIFFS' COMPLAINT**

Plaintiffs Mark Stang and Stuart Cohen brought this defamation action, alleging in their Complaint against Defendants URJ, Rabbi Pesner and Rabbi Cohn, that:

"This action arises out of Defendant Pesner's libel of American Jews, including by imputation the Plaintiffs in this action, as (i) 'racists' who are purportedly bigoted against African-Americans, in Plaintiffs' 'hearts,' 'communities,' 'congregations,' and 'synagogues,' and (ii) knowing and willing recipients of numerous benefits of

2

'white privilege'... whereby 'white Jews have reaped the rewards of racism,'"
...(Complaint, par. 1).

"People can differ strenuously about and debate the legality, morality, and
feasibility of imposing slavery reparations ... Those issues and that debate are not
the subject of this action. But nothing justifies any proponent or opponent of slavery
reparations committing group libel against an identifiable racial, ethic, or religious
group, necessarily imputed to each of the group's members ... "(par. 10).

"Defendants are attempting to foist upon white American Jews the libelous
presumption that they should all be deemed racists and culpable recipients of
'white privilege.'" (par. 14).

Plaintiffs' Complaint alleges the terms, among others, "racists," "purportedly," "group"
libel, "necessarily imputed" and "libelous presumption." None of these terms quoted
above, however, amount to libel.

## III.    <u>ARGUMENT</u>

### A.  Standards for a F.R.C.P. Rule 12(b)(6) Motion to Dismiss

The Federal Rules of Civil Procedure require that a complaint provide the
defendant with "fair notice of what the ... claim is and the grounds upon which it rests."
*Bell Atlantic v. Twombly*, 550 U.S. 544, 555, 127 S.Ct.1955, 167 L.Ed.2d 929 (2007). In
reviewing the sufficiency of their complaint, the Court must accept as true all well-pleaded
facts and draw all permissible inferences in favor of the Plaintiffs. A Rule 12(b)(6) motion
to dismiss asks whether the complaint "contain[s] sufficient factual matter, accepted as
true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662,
678, 129 S. Ct. 1937, 173 L. Ed.2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570).

A Rule 12(b)(6) motion to dismiss therefore challenges the legal sufficiency of a
complaint. *Twombly*, 550 U.S. at 570. This standard requires the plaintiffs to provide
"more than labels and conclusions because a formulaic recitation of the elements of a
cause of action will not do." *Id.* Moreover, the Court is not bound to accept as true a legal

3

conclusion couched as a factual assertion, *Iqbal,* 556 U.S. at 679, and it "should not accept as adequate abstract recitations of the elements of a cause of action." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). The Court need not ignore facts in the complaint that undermine the plaintiffs' claims nor give weight to unsupported conclusions of law. *Id.*

In a diversity case, as here, a federal court applies the substantive law of the forum state, including the applicable elements of the tort cause of action. Illinois law requires that for defamation to exist, there must be reputational harm, lowering the "person in the eyes of the community." *Bryson v. News American Publication, Inc.*, 174 Ill.2d 77, 88-89; 220 Ill.Dec. 15, 672 N.E.2d 1207 (1996). To successfully state a defamation claim, the plaintiff's complaint must "allege facts establishing that the defendant made a false statement about the plaintiff, that the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages." *Solaia Technologies, LLC v. Specialty Publishing Company*, 221 Ill.2d 558, 580-82, 304 Ill.Dec. 369, 852 N.E.2d 825 (2006). A publication that is defamatory on its face is actionable as defamation *per se*, and plaintiffs alleging *per se* defamation do not need to plead actual damage to their reputations. *Owen v. Carr*, 113 Ill.2d 273, 277, 100 Ill.Dec. 783, 497 N.E.2d 1145 (1986). Under Illinois common law, those *per se* categories of statements include "words that impute an inability to perform" and "words that prejudice a party, or impute a lack of ability, in his or her trade, profession or business." *Bryson*, 174 Ill.2d at 87, 672 N.E.2d at 1214.

None of those elements of the common-law tort of libel are alleged in the Complaint in this action. For that reason, Plaintiffs' claims fail to state a cause of action pursuant to

Rule 12(b)(6) of the Federal Rules of Civil Procedure, and this Court should therefore dismiss Plaintiffs' complaint with prejudice.

### B.  Plaintiffs' Claims are Barred in their Entirety as Non-Defamatory

Plaintiffs argue that Defendant Pesner's use of "racist" to describe all "white American Jews" is not just judgmental, but also factual. In *Stevens v. Tillman*, 855 F.2d 394, 395 (7th Cir. 1988), however, Judge Easterbrook addressed the use of the term "racist" as exchanged between two women, the named parties to that action:

> Curiously, Stevens does not contend that the jury should have been allowed to consider whether Tillman's oratory implied to listeners that Stevens had made the kind of statements that all ears find repellant. Stevens contends that the epithet "racist" is itself actionable because it marks her as unfit to be principal of a public school and because Tillman used the term (in conjunction with the claim that she had conducted an "investigation") to imply possession of derogatory information. The results of the "investigation", such as it was, were spread before the jury. We do not think a court of Illinois would agree that the term itself is actionable, so again we do not consider any constitutional argument.

> Illinois has competing doctrines: first, the statements impugning one's professional competence are actionable without further proof of injury; second, that "mere name-calling" is not actionable. [Citations omitted.] We shall not pretend to be able to harmonize these cases.

> We do not think it necessary to wrestle with the subject in light of *Owen v. Carr*, the most recent word from the Supreme Court of Illinois, which held that "[l]anguage to be considered defamatory must be so obviously and naturally harmful to the person to whom it refers that a showing of special damages is unnecessary." 497 N.E.2d at 1147, 100 Ill.Dec. at 785. *Owen* ruled that, as a matter of law, an accusation that an attorney filed a complaint "deliberately to intimidate" the defendants was not actionable, although the comment implied professional wrongdoing.

> Accusations of "racism" no longer are "obviously and naturally harmful." The word has been watered down by overuse, becoming common coin in political discourse. Tillman called Stevens a racist; Stevens issued a press release calling Tillman a "racist" and her supporters "bigots". ... That may be an unfortunate brand of politics, but it also drains the term of its former, decidedly opprobrious, meaning. ... Meanings of this sort fit comfortably within the immunity for name-calling.

5

… We may regret that the language is losing the meaning of a word, especially when there is no ready substitute. But we serve in a court of law rather than of language and cannot insist that speakers cling to older meanings. In daily life "racist" is hurled about so indiscriminately that is no more than a verbal slap in the face; the target can slap back (as Stevens did). It is not actionable unless it implies the existence of undisclosed, defamatory facts, and Stevens has not relied on any such implication.

Where, as in this case, Plaintiffs' Complaint cannot point to any statement that is in the first instance "false," that critical element of a tort cause of action for libel is missing.

### C.   Plaintiffs' Claims are Not "Of and Concerning" Plaintiffs

To qualify as actionable defamation, a statement must sufficiently identify the person who is being criticized. The measuring stick is the law's ubiquitous "reasonable" person: a "reasonable individual" reading the statement must be able to "identify" a particular plaintiff as the subject. If a statement can be reasonably interpreted as referring to someone else, it fails to qualify as even being a statement targeting the plaintiff. *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 927 (7th Cir. 2003).

If "extrinsic facts and circumstances" are needed to show that a statement refers to a particular plaintiff, it is not "injurious to him on its face" – and thus does not qualify as defamation. *Schaffer v Zekman*, 196 Ill.App.3d 727, 143 Ill.Dec. 916, 554 N.E.2d 988, 991 (1st Dist. 1990); *Lansing v. Carroll*, 2015 WL 3962345, *4 (N.D. Ill. June 29, 2015). It would take evidence beyond the face of the complaint to connect either of the Plaintiffs to its allegations, so the statements do not qualify as defamation *per se. Schaffer*, 143 Ill.Dec. 916, 554 N.E.2d at 991.

*New York Times Co. v. Sullivan*, 376 U.S. 254, 288-91, 84 S.Ct. 1130, 12 L.Ed.2d 83 (1964), for example, held that the statements in a defamatory advertisement were too far removed from Commissioner Sullivan to support that the statements were "of and

6

concerning" him. In general, therefore, racial slurs, insults and epithets against large groups do not support a defamation cause of action.

In response to this motion, the Plaintiffs will no doubt argue that labeling all white American Jews as "racist" qualifies as "group" defamation. Under this theory, a statement that refers to a group – rather than to a specific person by name – still qualifies as identifying the persons in the group only if the group is "sufficiently small and the words may reasonably be understood to have personal reference and application to any member of the group." *Missner v. Clifford*, 393 Ill.App.3d 751, 761, 333 Ill.Dec. 121, 914 N.E.2d 540 (1st Dist. 2009), citing Restatement (Second) of Torts 564A, Comment b (American Law Institute 1977). But "white American Jews," which, at most recent count, number more than 3.7 million adults, do not meet that limiting definition. "Population Estimates for Jewish Adults by Age, Education and Race, 2019." *Source: American Jewish Population Project, 2019 Jewish Population Estimates (Release Date: August 2019).*

### D.  Plaintiffs' Complaint Alleges Only an Opinion

Another reason why the statements at issue in Plaintiffs' Complaint cannot be the premise of defamation *per se* claims is that the statements are constitutionally protected expressions of *opinion*, rather than factual assertions. *Board of Forensic Document Examiners, Inc. v. American Bar Association*, 287 F.Supp.3d 726, 732 (N.D. Ill. 2018). The First Amendment protects the expression of opinions. "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition

of other ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). So defamation claims cannot be premised on an opinion.

A statement is only protected as an opinion if it "cannot be reasonably interpreted as stating actual fact." *Solaia Technologies, LLC v. Specialty Publishing Co.*, 221 Ill.2d 558, 580-82, 304 Ill.Dec. 369, 852 N.E.2d 825 (2006). In *Solaia*, the Illinois Supreme Court evaluated the opinion-versus-fact dichotomy by considering whether the statement has a precise and readily understood meaning; whether the statement is verifiable; and whether the statement has a literary or social context that shows that it is a factual assertion rather than an opinion. The court there considered the defendants' use of the phrase "deeply greedy people" to describe the plaintiffs:

> This statement clearly impugns the plaintiffs' integrity and thus falls within one of the recognized categories of defamation *per se*. But it also falls within the bounds of constitutionally protected opinion. The phrase "deeply greedy people" has no precise meaning, and it is not verifiable. Further, the context in which that phrase appeared indicates that it may have been judgmental, but it was not factual. This statement is not actionable.

Here, Rabbi Pesner's opinion editorial was first published on a page of the *Chicago Tribune* under the banner "Perspectives" – indicating that it was intended as commentary, and not as factual reporting (Exhibit A). It was since reprinted in online editions of the *Tribune* after the additional headlines "Commentary" (Exhibit B), and on the UJR web pages after "Op-Ed" (Exhibit C). In that context, no reasonable reader could have regarded any part of it as factual.

### E. Plaintiffs' Complaint Fails to Adequately Plead "Special" Damages

Rabbi Pesner's use of the word "racist" in his opinion editorial is not libel *per se* so "obviously and naturally harmful" to them that a showing of "special" damages is rendered unnecessary. The Plaintiffs' Complaint alleges in identical language that each of Plaintiff

8

Stang and Cohn "suffered damage" to his "reputation" and to his "law practice" from the allegation that they "willfully benefited from 'white privilege'" (pars. 50, 54). To the contrary, Plaintiffs spend several pages of their twenty-two-page Complaint distinguishing their own personal background and history from the contrary characterizations of the "benefits" afforded white American Jews made in Rabbi Pesner's commentary (pars. 25-53).

The dollar amount of Plaintiffs' claimed damage is alleged, but not its source or how that number was arrived at, in wholly conclusory terms:

> "As a result of Defendants' libels... Plaintiffs have sustained and will continue to sustain damages in the amount of at least $1.8 million." (par. 80)

> "Punitive damages of at least $6 million are warranted against Defendants as their libels against American Jews are not only false, but knowingly false and malicious, made with (i) the intention of coercing American Jews to support Defendants' and Al Sharpton's political goals, and (ii) the foreseeable effect of fomenting racial divisiveness in the country, generally, and inciting property crimes and violent hate crimes, including murder and attempted murder, against American Jews from both the left and right, specifically." (par. 81)

These specific amounts, $1.8 million and $6 million, do not represent or even purport to represent any "actual" damages, "special" or otherwise. Rather, as Plaintiff Mark Stang stated to a *Chicago Daily Law Bulletin* reporter, these numbers both have special significance to the Jewish people – "18" is connected to the Hebrew word for "life," and six million is the number of Jews killed in the Holocaust (Exhibit D).

## IV.    CONCLUSION

The allegations of Plaintiffs' Complaint do not amount to any actionable claim of libel under federal rules of pleading or under Illinois elements of that tort. The term "racist" is simply not false. The term is not "of and concerning" the Plaintiffs, who are only two of

the "white American Jews" numbering more than three million. It is not factual, but only an opinion. And Plaintiffs' Complaint does not allege any special damages.

WHEREFORE, Defendants UNION FOR REFORM JUDAISM, JONAH DOV PESNER, and RICHARD "RICK" JACOBS, pray that this Court enter an Order granting their Motion to Dismiss, dismissing Plaintiffs' Complaint with prejudice, and granting any other and further relief that this Court deems equitable and just, including the costs of defending this matter.

Dated: March 18, 2020

UNION FOR REFORM JUDAISM, JONAH DOV PESNER, and RICHARD "RICK" JACOBS

By: _____
    Mitchell H. Frazen
    LITCHFIELD CAVO LLP
    Their Attorneys

Mitchell H. Frazen
LITCHFIELD CAVO LLP
303 West Madison, Suite 300
Chicago, Illinois 60606
312.781.6618
Frazen@LitchfieldCavo.com
A.R.D.C No. 3127118

STANG v. UNION FOR REFORM JUDAISM

MOTION TO DISMISS

# EXHIBIT A

Chicago Tribune (Chicago, Illinois) · Wed, Dec 11, 2019 · Page 18    PRINT/SAVE    SHARE

18 | Chicago Tribune | Section 1 | Wednesday, December 11, 2019

## *Chicago Tribune*

# PERSPECTIVE



House Speaker Nancy Pelosi, center, appears at a news conference Tuesday where Democrats unveiled articles of impeachment against President Donald Trump.

ANDREW HARNIK/AP

# Get real, Democrats, and fight for public support of impeachment



**ERIC ZORN**

On NBC's "Meet the Press" on Sunday, moderator Chuck Todd displayed a chart labeled "ads on impeachment" aired, December 1-7."

"GOP affiliated, 4,265," said the chart, attributed to NBC News. "Dem affiliated, 1."

Todd turned to panelist Stephanie Cutter, a Democratic campaign strategist. "I know that Democrats didn't want to look like they were politicizing this," he said, "but we're at this public-opinion paralysis ... Republicans have done a paid media campaign, and it's at least worked to get it to where we are."

"Where we are" is close to evenly split in a nation still hardened in our positions. Two respected poll-aggregation sites, FiveThirtyEight and Real-ClearPolitics, show support and opposition levels for the House impeachment inquiry into Republican President Donald Trump basically where they were in early October, well before the House Intelligence Committee hearings that featured witnesses after witness testifying to Trump's abuses of power.

As of Tuesday afternoon, the FiveThirtyEight average of polls showed 47.7% support for impeachment, and 43.6% opposition. The Real-ClearPolitics average of polls asking about impeachment and removal has support at 47.7%, opposition at 47.9%. Such narrow margins aren't nearly enough to generate the sort of groundswell that would be necessary to prompt Republican lawmakers to renounce their support of the president.

"Democrats are running 'ads,'" said Cutter when she got around to addressing Todd's implicit question, "but they're running ads on things like getting prescription drugs done or reforming the health care system."

Impeachment, she said a moment later, is about "abuse of power and breaking the public trust. That's serious. That's not something you put on Facebook ads. ... And Democrats will get credit for that."

Charming! As if we lived in a nation where people disdained noise, spin and propaganda, and tuned out political ads in order to answer weighty questions for themselves. As if voters have shown any inclination whatsoever in recent years to sober-minded high-mindedness.

What's really going on is that Democrats are bringing a spork to a gunfight.

The Washington Post reported over the weekend that, in the last month, "independent big money groups boosting Republicans have launched roughly $10 million in ads aimed at Democrats in districts that President Trump won in 2016," while the Democrats parry-celled back with a two-week, $1.5 million campaign in support of their vulnerable incumbents.

On Facebook, Republican ad spending has tripled Democratic spending, and "none of the 30 Democrats who are being targeted by national GOP groups ran Facebook ads in the past month to counter the attacks."

Yes, impeachment in the House and a trial in the Senate ought to be dignified, truth-seeking, evidence-based procedures free from partisan cant and inflammatory histrionics. We all ought to weigh the facts against the demands of the Constitution and reach an independent judgment about whether the president has so gravely violated his oath of office that he should no longer serve.

But this is all taking place in the real world.

I have no doubt that the Democrats have made a solid case for impeachment. Yet I have no hope that, absent blockbuster new evidence, even a massive ad blitz would move the Republican-controlled Senate to muster the 67 votes in that chamber needed to convict and remove Trump.

That's not the point of the call for more advertising. The point is that if Democratic members of the House are on the list of those who occupy seats in districts won by Trump in 2016 and thought to be particularly vulnerable in the 2020 election lose them 11 months from now. That list includes Rep. Lauren Underwood of Naperville and Rep. Cheri Bustos of Moline. And if Republicans win back a little more than half of those seats, they'll regain control of the House, which would be an epic disaster if the numerically inclined Trump is reelected.

An effective campaign to counter the Republican ad campaign could help save the vulnerable members. Yes, the articles of impeachment presented Tuesday are strong. But bills of particulars don't rile up the masses. A combination of images, music and thunderous assertion in a barrage of TV commercials would be a far stronger way to persuade swing voters in these swing districts and elsewhere that the evidence against Trump is serious and persuasive enough for a person of principle to demand a trial in the Senate.

I'd suggest starting with spots attacking Trump for his cowardice — his fear of testifying under oath or allowing those in his inner circle to testify under oath about the White House's dealings with Ukraine.

Tagline: What are they hiding?

Follow that with 30- and 60-second explanations of the damning timeline of events — how Trump released congressionally approved military aid to Ukraine only after he learned that someone had blown the whistle on his attempt to use that aid to coerce the Ukrainian government to announce an investigation into his 2016 political rival. Then a spot debunking the notion that Trump had genuine concerns about corruption and nepotism, including obliging allusions to how suction his own hands are on this issue.

Tagline: Trump is just the sort of president the Founders were afraid of.

The hurdle for the Republican Senate to convict appears hopelessly low. But the hurdle for the approval of the voters who will shape the next four years has just begun. Jump in, Democrats!

ericzorn@gmail.com
Twitter @EricZorn

---

# As Reform Jews, we must consider reparations for American slavery

**BY JONAH PESNER**

Americans in general and faith groups in particular increasingly find ourselves reckoning with our nation's bigoted history and struggling with how to dismantle the racist systems and structures that persist to this day. As the largest Jewish denomination in the United States, it's time for the Reform movement to join this conversation. It's time for us to talk reparations.

When I first read "The Case for Reparations," Ta-Nehisi Coates' groundbreaking article "The Case for Reparations," I thought of a blessing that I, like many Jews, have said so many times throughout my life, including in my own children, the Birkat Kohanim, or the priestly blessing, which begins with the line, "May God bless you and keep you." Its simplicity is eloquent and profound, and while it is about protection, the reference to "bless you" in the biblical text particularly refers to abundance and prosperity.

African slaves and their descendants had their freedom, self-determination, bodies, communities, ability to inherit and pass down wealth to their loved ones, possessions and, most important, their humanity, systematically stolen from them. Reparations are an attempt to offer a restoration of their rightful blessings. This week, thousands of Reform Jews will come together at we hope, the nation. We will consider a resolution that would make it our policy to support the exploration of reparations for American slavery. To reach that goal, Reform Jews and our institutions must start participating in the dialogue around what a just reparations system looks like and calling on our elected officials to do the same.

With a few notable exceptions, the Jewish community, which is so often proudly on the front lines of social justice causes, has remained quiet on the subject of reparations. Our silence is an implicit claim that we have no role to play or no responsibility to act. But we must engage with the continued legacy of slavery.

We find ourselves in an era of reckoning, of cultural shifts, the rejection of a racist history and of ongoing racist systems and structures. Comfortable statures are coming down, great children are once educating their elders about white privilege and universal lies are moving to atone for their roles in perpetuating our democracy's original sins of slavery and colonization. As the largest Jewish denomination in the United States, it's time for the Reform movement to accelerate our work for racial justice.

Some in our community may not think this is our responsibility. A tiny number of American Jews owned slaves, with most white American Jews immigrating long after the end of slavery and long after the Civil Rights Movement of the 1960s.

Our Jewish community is tremendously diverse, including Jews of color who are descendants of enslaved African people, but many of us have white Jewish grandparents who arrived in the United States in the early 1900s with very little. They overcame anti-Semitism, poverty and displacement to achieve stability and, in many races, success. And without diminishing their sacrifices or the challenges they faced, we can now understand that they, and many of us also benefited from, and continue to benefit from, the same white privilege that allows for the continued discrimination against black Americans. Even how we gained entry into this country to the places we were allowed to live and work, to access to education and financial capital, white Jews have reaped the rewards of racism.

In other words, this is complex. But our tradition teaches us that we can — and often must — hold in our hands two opposing truths in order to understand the complexity of the world.

It is not only atonement that we seek, but also justice. What do we as white Jews do when we realize that so many of us have benefited from whiteness — even as we still have faced discrimination of our own? How do we hold these two truths in our hands?

without reconciliation. True freedom from Egypt required the Israelites to be compensated for their unpaid labor and oppression — compensation they used to build our holy place for worship in the desert, the Mishkan. After the Holocaust, the German government sought to reclaim its place in the global community partly through payments that have been critical to the financial stability of families devastated by the Holocaust.

The resolution we will grapple with at the URJ Biennial does not define what form reparations ought to take. Instead, just like congressional legislation calling for a committee to study and develop proposals for reparations, which our resolution endorses, we consider it our sacred duty to "seek an end to ignorance." Knowledge must then transform into action against the racism still lingering in our congregations and communities, and a clearer sense of what true reparations might look like.

The URJ's resolution is about confronting racism in our country, our synagogues and our hearts. We cannot expect to be a spiritually renewed community — or country — without the airing of truths and a coming to terms with our great sins and silence.

*Rabbi Jonah Pesner is the director of the*

## STANG v. UNION FOR REFORM JUDAISM

## MOTION TO DISMISS

# EXHIBIT B

Case: 1:20-cv-00757 Document #: 8 Filed: 03/18/20 Page 14 of 25 PageID #:76

ADVERTISEMENT

COMMENTARY    OPINION

# Commentary: As Reform Jews, we must consider reparations for American slavery

By JONAH PESNER
CHICAGO TRIBUNE   |   DEC 10, 2019   |   1:27 PM



Ta-Nehisi Coates, who wrote "The Case for Reparations." (Andre Chung/for The Washington Post)


ADVERTISEMENT

reviewtrackers

Get more ratings, reviews and revenue.

Get My Free Demo

Americans in general and faith groups in particular increasingly find ourselves reckoning with our nation's bigoted history and struggling with how to dismantle the racist systems and structures that persist to this day. As the largest Jewish denomination in the United States, it's time for the Reform movement to join this conversation. It's time for us to talk reparations.

When I first read Ta-Nehisi Coates' groundbreaking article "**The Case for Reparations**," I thought of a blessing that I, like many Jews, have said so many times throughout my life, including to my own children: the Birkat Kohanim, or the priestly blessing, which begins with the line, "May God bless you and keep you." Its simplicity is eloquent and profound, and while it is about protection, the reference to "bless you" in the biblical text particularly refers to abundance and prosperity.

**LATEST COMMENTARY**

COMMENTARY

Commentary: Living in Trump's Post-Integrity America
FEB 21, 2020

COMMENTARY

Commentary: All-Star game festivities wake up memories of



Advertisement

a childhood spent loving basketball and Chicago

FEB 21, 2020

COMMENTARY

Flashback: Cook County Hospital was home to big egos, surgical drama and stalwarts who found purpose in treating the poor

FEB 21, 2020

COMMENTARY

Commentary: If Pritzker wants real pension reform, he may need to amend his 'fantasy' swipe

FEB 20, 2020

COMMENTARY

Commentary: How the Chinese Communist Party intimidates overseas Chinese citizens

FEB 20, 2020

**Column: How the term 'reparations' is getting in the way of historical justice »**

African slaves and their descendants had their freedom, self-determination, bodies, communities, ability to inherit and pass down wealth to their loved ones, possessions and, most important, their humanity, systematically stolen from them; reparations are an attempt to offer a restoration of their rightful blessings. This week, thousands of Reform Jews will come together at the Union for Reform Judaism Biennial in Chicago to make decisions directing the social justice work of our movement and, we hope, the nation. We will consider a resolution that would make it our policy to support the exploration of reparations for American slavery. To reach that goal, Reform Jews and our institutions must start participating in the dialogue around what a just reparations system looks like and calling on our elected officials to do the same.

With a few **notable exceptions**, the Jewish community, which is so often proudly on the front lines of social justice causes, has remained quiet on the subject of reparations. Our silence is an implicit claim that we have no role to play or no responsibility to act. But we must engage with the continued legacy of slavery.

We find ourselves in an era of reckoning, of cultural shifts, the rejection of a racist history and of ongoing racist systems and structures. Confederate statues are coming down, grandchildren are educating their elders about white privilege and universities are moving to atone for their roles in perpetuating our democracy's original sins of slavery and colonization. As the largest Jewish denomination in the United States, it's time for the Reform movement to accelerate our work for racial justice.

**[Most read] Chicago area will be under a winter storm watch Tuesday, forecasters say 6 inches of snow possible »**

Some in our community may not think this is our responsibility. A tiny number of American Jews owned slaves, with most white American Jews immigrating long after slavery was abolished. We are proud that decades later, many Jews were allies to African American organizers during the Civil Rights Movement of the 1960s.

Advertisement



ADVERTISEMENT

Our Jewish community is tremendously diverse, including Jews of color who are descendants of enslaved African people, but many of us have white Jewish grandparents who arrived in the United States in the early 1900s with very little. They overcame anti-Semitism, poverty and displacement to achieve stability and, in many cases, success. And without diminishing their sacrifices or the challenges they faced, we can now understand that they and many of us also benefited from, and continue to benefit from, the same white privilege that allows for the continued discrimination against black Americans. From how we gained entry into this country to the places we were allowed to live and work, to access to education and financial capital, white Jews have reaped the rewards of racism.

In other words, this is complex. But our tradition teaches us that we can — and often must — hold in our hands two opposing truths in order to understand the complexity of the world.

It is not only atonement that we seek, but also justice. What do we as white Jews do

SEARCH    Search                                                    12 WEEKS FOR 99¢    LOG IN

hands?



**Fighting Words Newsletter**
Twice-weekly

Receive the Chicago Tribune's latest editorials, commentaries and columns, delivered to your email box twice a week.

ENTER YOUR EMAIL ADDRESS

We are responsible because our texts are **laced** with stories and **commandments** of reparations, of the impossibility of justice without reconciliation. True freedom from Egypt required the Israelites to be compensated for their unpaid labor and oppression — compensation they used to build our holy place for worship in the desert, the Mishkan. After the Holocaust, the German government sought to reclaim its place in the global community partly through payments that have been critical to the financial stability of families devastated by the Holocaust.

[Most read] Jussie Smollett pleads not guilty to new charges in Chicago as his lawyers ask state's high court for a stay »

The resolution we will grapple with at the URJ Biennial does not define what form reparations ought to take. Instead, just like **congressional legislation** calling for a committee to study and develop proposals for reparations, which our resolution endorses, we consider it our **moral duty** to "seek an end to ignorance." Knowledge must then transform into action against the racism still lingering in our congregations and communities, and a clearer sense of what true reparations might look like.

**LATEST COMMENTARY**

Commentary: Living in Trump's Post-Integrity America
FEB 21, 2020

Commentary: All-Star game festivities wake up memories of a childhood spent loving basketball and Chicago
FEB 21, 2020

Flashback: Cook County Hospital was home to big egos, surgical drama and stalwarts who found purpose in treating the poor
FEB 21, 2020

Commentary: If Pritzker wants real pension reform, he may need to amend his 'fantasy' swipe
FEB 20, 2020

Commentary: How the Chinese Communist Party intimidates overseas Chinese citizens
FEB 20, 2020

The URJ's resolution is about confronting racism in our country, our synagogues and our hearts. We cannot expect to be a spiritually renewed community — or country — without the airing of truths and a coming to terms with our past sins and silence.

*Rabbi Jonah Pesner is the director of the Religious Action Center of Reform Judaism and senior vice president of the Union for Reform Judaism.*

*Submit a letter, of no more than 400 words, to the editor* **here** *or email* **letters@chicagotribune.com**.

*Get our latest editorials, commentaries and columns, delivered twice a week in our Fighting Words newsletter.* **Sign up here.**

---

**RECOMMENDED ON CHICAGO TRIBUNE**

Column: Rod Blagojevich, Donald Trump and the circle of sleaze

That tongue-trilling sound that Shakira made at the Super Bowl? That was a zaghrouta, the traditional Middle Eastern expression of joy.

Blagojevich's crimes: 20 charges, 3 schemes and a lie

Editorial: As Trump frees Blagojevich: Fresh injustice for the 12 million victims of Illinois corruption

Kelly Crull, the former Cubs in-game reporter for NBC Sports Chicago, lands a job covering the Braves for Fox Sports South



IN THE WAKE OF
THE EARTHQUAKE IN NEPAL
MONETARY DONATIONS
HELP THE MOST

Cheap Preowned Luxury Cars Almost Like New!
LUXURY CARS | SEARCH ADS | SPONSORED

STANG v. UNION FOR REFORM JUDAISM

MOTION TO DISMISS

# EXHIBIT C



March 16, 2020 | 20 Adar, 5780    INSIDE LEADERSHIP    CALENDAR    FIND A CONGREGATION    THE TENT

GIVE TO URJ

UNION for REFORM JUDAISM

What We Believe    What We Do    Who We Are    🔍 Search

Inside Leadership

# Op-Ed: As Reform Jews, We Must Consider Reparations for American Slavery

By Rabbi Jonah Dov Pesner , 12/12/2019 |    🐦 📌 |  🖨 Print ✉ 📗



Ta-Nehisi Coates, who wrote "The Case for Reparations." (Andre Chung/for The Washington Post)

*Americans in general and faith groups in particular increasingly find ourselves reckoning with our nation's bigoted history and struggling with how to dismantle the racist systems and structures that persist to this day. As the largest Jewish denomination in the United States, it's time for the Reform movement to join this conversation. It's time for us to talk reparations.*

*When I first read Ta-Nehisi Coates' groundbreaking article* "The Case for Reparations," *I thought of a blessing that I, like many Jews, have said so many times throughout my life, including to my own children: the Birkat Kohanim , or the priestly blessing, which begins with the line, "May God bless you and keep you." Its simplicity is eloquent and*

## What's New



URJ in the News: Reverend, Rabbi Discuss Role of Faith in Activism

**Feb 24, 2020** |
**Khue Tran (Yale Daily News)**

How the RAC's Work Created Change in 2019

**Jan 19, 2020** | **Arno Rosenfeld**

Now Is the Time to Make Our Houses of Worship Fully Accessible

**Feb 13, 2020** |
**Sheri Denkensohn-Trott**

## Find More in The Tent

profound, and while it is about protection, the reference to "bless you" in the biblical text particularly refers to abundance and prosperity.

African slaves and their descendants had their freedom, self-determination, bodies, communities, ability to inherit and pass down wealth to their loved ones, possessions and, most important, their humanity, systematically stolen from them; reparations are an attempt to offer a restoration of their rightful blessings.

This week, thousands of Reform Jews will come together at the Union for Reform Judaism Biennial in Chicago to make decisions directing the social justice work of our movement and, we hope, the nation. We will consider a resolution that would make it our policy to support the exploration of reparations for American slavery. To reach that goal, Reform Jews and our institutions must start participating in the dialogue around what a just reparations system looks like and calling on our elected officials to do the same.

**Read the entire op-ed in the *Chicago Tribune*, then join the conversation on Facebook.**

**Have something to say about this post? Join the conversation in The Tent, the communications and collaboration platform for congregational leaders of the Reform Movement. You can also tweet us or tell us how you feel on Facebook.**



Learn more about this exciting new platform, where Reform congregational leaders connect with colleagues and peers who have similar concerns, interests and responsibilities.

Visit The Tent →

---



### Rabbi Jonah Dov Pesner

***Rabbi Jonah Dov Pesner*** *represents the Reform Movement to Congress and the administration as the director of the Religious Action Center of Reform Judaism . He also serves as the senior vice president of the Union for Reform Judaism . Named one of the most influential rabbis in America, he has been an inspirational leader, creative entrepreneur, and tireless advocate for social justice.*

**More From This Author →**

---

**Source:**

The Chicago Tribune

**Categories:**

Social Justice & Advocacy

**Tags:**

Social Justice, Advocacy, Race Relations, Jewish Values, Biennial, Biennial 2019, URJ Biennial

---

**More Like This**



**URJ in the News: Reverend, Rabbi Discuss Role of Faith in Activism**



**Now Is the Time to Make Our Houses of Worship Fully Accessible**



**How the RAC's Work Created Change in 2019**

# The Union for Reform Judaism

633 Third Avenue, New York, NY 10017

NYC Headquarters: 212.650.4000 | Knowledge Network : 855.URJ.1800 | Washington DC Office ( RAC): 202.387.2800

## Follow The Union For Reform Judaism

     

## Sign Up for our E-Newsletters →

Subscribe to receive emails from the URJ.

CONTACT US | PRIVACY POLICY | TERMS OF USE | CAREERS

©2020 Union For Reform Judaism. All rights reserved.

STANG v. UNION FOR REFORM JUDAISM

MOTION TO DISMISS

# EXHIBIT D

Client:  3718-62  🖉                        WELCOME, MITCHELL

People        *Enter search terms - Exact match*

# Suit: Rabbi's op-ed, call for reparations amounts to 'group libel' against Jews

By Marc Karlinsky
Chicago Daily Law Bulletin
February 4, 2020

Two Chicago-area Jewish attorneys are suing the nation's largest Jewish religious movement, alleging the organization's call for reparations for slavery amounted to libel of all American Jews and, by imputation, the two of them.

Mark A. Stang, owner of the Stang Law Firm in Highland Park, filed the federal complaint against the Union for Reform Judaism, its president, Rabbi Rick Jacobs, and its vice president, Rabbi Jonah Pesner. The suit seeks $1.8 million in compensatory damages and $6 million in punitive damages.

Pesner, director of the group's Religious Action Center, authored an op-ed published by the Chicago Tribune in mid-December, days before the group hosted its 5,000-attendee biennial conference at McCormick Place.

In the opinion piece, Pesner advocated for more introspection and action by the American Jewish community toward issues of racism and discrimination.

During the five-day convention, the group passed a resolution calling for the creation of a federal commission to study proposals for reparations to descendants of enslaved people. The resolution also called for Reform Jewish congregations and their members to "take active steps to redress the destructive effects of historic and ongoing systemic racism" and to "strengthen our own institutions' efforts to combat implicit and explicit bias and promote racial inequality."

Suing on behalf of himself and attorney Stuart A. Cohn, Stang's complaint alleges the Pesner op-ed libels American Jews as "'racists' who are purportedly bigoted against African Americans, in [p]laintiff's 'hearts,' 'communities,' 'congregations' and 'synagogues' and as "knowing and willing recipients of numerous benefits of 'white privilege' …."

Pesner's op-ed addressed his belief that, although Jewish immigrants to the U.S. since the early 1900s have faced and have overcome anti-Semitic discrimination, "they and many of us also benefited from, and continue to benefit from, the same white privilege that allows for the continued discrimination against black Americans."

"From how we gained entry into this country to the places we were allowed to live and work, to access to education and financial capital, white Jews have reaped the reward of racism," the rabbi wrote.

Stang argued in the complaint that the Jewish group's proposal would make reparations "required of all white Jews, regardless of whether said white Jews' ancestors were American slaveholders or immigrated to the United States from Europe decades after the defeat of the Confederacy and the abolition of slavery in 1865."

Following a reference to the Holocaust and the millions of European Jews killed by Nazi Germany and its collaborators during World War II, Stang wrote in his complaint that "never in the darkest hours of the Nazi era did people claiming to be Jews, like the individual defendants … so unhesitatingly and publicly libel and vilify the Jewish people."

Stang then turned to the Reform rabbis' relationship with the Rev. Al Sharpton — a prominent proponent of reparations — before listing Sharpton's own record of allegedly anti-Semitic remarks.

Stang wrote that a policy debate over reparations is fair game. "But nothing justifies any proponent or opponent of slavery reparations committing group libel against an identifiable racial, ethnic or religious group, necessarily imputed to each of the group's members, in perceived furtherance of their advocacy about the issue."

And he continued that the rabbi's pronouncements have served to incite "ethnic hatred and violence toward American Jews."

Nearly eight pages of the 22-page complaint offer genealogical and biographical details about Stang and Cohn. Stang submitted a copy of his father's Polish passport into the court record.

Stang wrote that both he and Cohn are sole practitioners who represent clients of color.

Both attorneys allege they have "suffered damage, and will continue to suffer damage," to their reputations and practices "by [d]efendants' libelous statements accusing American Jews … of being racists who have willfully benefited from 'white privilege' to the detriment of African American citizens (and, by implication, to the detriment of all people of color)."

Stang wrote in the complaint that he submitted to the Tribune a critical response to the op-ed, but that the editorial board and the newspapers' management opted not to publish it or any similar pieces by others.

In a phone interview with the Daily Law Bulletin on Monday afternoon, Stang described his case as "an action alleging a group libel against all American Jews by the defendants."

Because both Stang and Cohn identify as Jewish, they have standing to address the libel, he said.

Stang said he is not equipped to turn the case into a class action, though he surmised such a class could be possible.

Stang said the demand for $1.8 million in damages is derived from a Jewish tradition behind the number 18, which is connected to the Hebrew word for life. And the demand for $6 million in punitive damages is a reference to the number of Jews killed during the Holocaust.

The lawsuit says any damages awarded from the lawsuit will go to charity.

"We're not virtue signalers like these rabbis," Stang said.

He said he found encouragement to bring the lawsuit after studying the U.S. Supreme Court's 1952 decision in Beauharnais v. Illinois, which upheld a state group-libel law that criminalized libel against racial or religious classes of people.

In that case, the high court affirmed the conviction of a man who handed out racist leaflets on the streets of Chicago. The court's 5-4 decision held that the provocative nature of the man's libelous speech went beyond what the Constitution protected as free speech.

Beauharnais is still on the books, but it was issued 12 years before the high court narrowed what it considers libel in the landmark 1964 New York Times Co. v. Sullivan decision.

Stang contends the Beauharnais precedent makes his group libel claim viable.

"If you can put someone in jail, there is a civil action for damages," he said.

The Union for Reform Judaism, which comprises about 850 synagogues and their 1 million congregants, brands its biennial conventions as the largest Jewish gathering in North America.

Asked why he's bringing his group libel case against members of the very group that's allegedly libeled, Stang said it's because he was particularly upset the words were issued from powerful figures in the community .

"It's coming from the two top leaders of the largest Jewish organization in America," Stang wrote.

As in any newly filed lawsuit, the complaint is one side's account of events and facts and none of the allegations have been tested in a courtroom.

A spokeswoman for the Union for Reform Judaism did not immediately return a request for comment.

The case is Mark Stang, et al., v. Union for Reform Judaism, et al., No. 20 C 757.

Case: 1:20-cv-00757 Document #: 8 Filed: 03/18/20 Page 25 of 25 PageID #:87

Practice Areas: Civil Rights, Constitutional Law

Lawyerport™, a division of Law Bulletin Media

Terms of Service      Privacy Policy      About Us      Site Map      Advertising      Contact Us      Help

Copyright © 2020 Law Bulletin Media. All rights reserved.