IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARK STANG and STUART COHN, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | No. 20 C 757 |
| | ) | |
| v. | ) | |
| | ) | |
| UNION FOR REFORM JUDAISM, | ) | Judge Matthew F. Kennelly |
| JONAH DOV PESNER, and | ) | |
| RICHARD "RICK" JACOBS, | ) | |
| | ) | |
| Defendants. | ) | |

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS THE COMPLAINT

I.   Introduction

Defendants have written and published false and defamatory statements about white American Jews' purported "racism" in fact-specific settings, *e.g.*, Jewish "synagogues," "congregations," and "homes." Defendants also have written and published false and defamatory statements about white American Jews' purported deliberate exploitation of "white privilege" to "reap the rewards of racism" with regard to specific past actions and ongoing activities, *e.g.*, their purported "access to education and financial capital," and their residences and workplaces.

Defendants' false statements, imputed from the libeled group to two of its members, the individual Jewish plaintiffs here, constitute defamation *per se*, based upon the Illinois Supreme Court's 2006 opinion in *Solaia* Technologies, cited by Defendants themselves (Mem. 6).

Defendants cannot avoid their liability for defamation *per se* by citing (Mem. 5-6) Judge Easterbrook's 1988 opinion in *Stevens v. Tillman* (decided in the District Court by jury verdict, not 12(b)(6) dismissal), which, as shown by Exhibit A hereto, Defendants have selectively and misleadingly quoted, and also apparently not cite-checked. As discussed below, Judge Easterbrook later opined in a 2000 employment case, *Taylor v. Carmouche,* that the accusation

that a person is "racist" may be deemed a defamatory statement of fact, one that gives rise to a slander suit. Surprisingly, Defendants did not cite *Taylor v. Carmouche* in their supporting memorandum, although it directly contradicts their argument about the holding in *Stevens*.

Far more disturbingly (in apparent disregard of their obligation to cite directly adverse controlling authority pursuant to Rule 3.3 (a)(2) of the Illinois Rules of Professional Conduct), Defendants also either overlooked or deliberately failed to cite a two-page May 11, 2018 Seventh Circuit opinion, *Jones v. Heartland Employment Services, LLC,* 721 Fed. Appx. 547, 548 (7th Cir. 2018) that explicitly distinguished Judge Easterbrook's 1988 opinion in *Stevens v. Tillman* from his later 2000 opinion in *Taylor v. Carmouche*.[1] The Seventh Circuit distinguished the two opinions from each other on the basis that *Stevens* did not apply to the *Jones* case because the allegedly defamed plaintiff in *Jones*, like the plaintiff in *Taylor*, could not "slap back" at his defamer with the same "racist" epithet, as teacher Dorothy Stevens had slapped back at PTA president Dorothy Tillman.

As discussed below, the plaintiffs here similarly could never have "slapped back" at the Defendants with the epithet of "racist" (or any similar defamatory label), so *Stevens v. Tillman* does not apply to this case either. The summary judgment in favor of the alleged libeler in *Jones,* entered by U.S. District Judge Colin S. Bruce of the Central District of Illinois, was affirmed by the Seventh Circuit on other grounds. However, any ruling by Judge Bruce in sole reliance on *Stevens v. Tillman* in *Jones* would have triggered an outright reversal by the Seventh Circuit. The same reversal result could have obtained here, hypothetically, if the Court had actually been led

---

[1] It required no extraordinary diligence by Plaintiffs' counsel to find the Seventh Circuit's 2018 controlling authority, adverse to the Defendants' argument, of *Jones v. Heartland Employment Services, LLC*. In the early 1980's counsel would have spent several hours manually shepardizing eyesight-fatiguing tables in large hard-cover volumes and multiple pocket parts. But cite-checking *Stevens* required only a single mouse-click on WestLaw's "citing cases" button, which produced a list of 112 citing cases in all jurisdictions, of which 15 were Seventh Circuit opinions. When Plaintiffs' counsel clicked on "newest first" on the "sort" drop-down menu, *Jones* appeared on the case list at # 2. Re-sorting by "court level" put *Jones* at # 1 on the *Stevens v. Tillman* citing case list.

2

down the primrose path by Defendants' improper citation of wholly inapposite *Stevens v. Tillman* without fulfilling their Rule 3.3(a)(2) obligations to the Court to disclose *Taylor* and *Jones.*

Plaintiffs acknowledge that this is not a "garden-variety" libel suit. At first glance, the case might not seem to fit neatly inside any experiential box. Indeed, the unique fact pattern of this case is somewhat akin to a "man bites dog" newspaper story, but is far more disturbing. Here, the startling facts are that two of the most powerful Jewish leaders in this country, *self*-described as the "most influential rabbis in America," have repeatedly bitten down on millions of innocent white American Jews, including the Plaintiffs, with odious libels, including the hateful age-old canard and trope flung at Jews by Jew-haters throughout history, that Jews everywhere enjoy special, exploitative, privileged "access to capital."

In deciding Defendants' Rule 12(b)(6) motion to dismiss, the Court does not need to extend, modify, or reverse any existing law. This action states a claim under existing law, properly construed to ascertain its meaning and scope, and applied to the facts of this action as pleaded (with all inferences to be drawn in Plaintiffs' favor at this juncture). This case is also intended to imbue the non-defendant leaders of the defendant URJ (*i.e.*, its quiescent board of directors) with a pro-active respect for human dignity, integrity, and truth, to which white American Jews are just as entitled as other Americans who seem to be the greater object of the Defendants' political agenda and solicitude.

II. Defendants' Statements that White American Jews are "Racists" in Specific Venues, and "Reap the Rewards of Racism" in Specific Activities, through their <u>"White Privilege," Constitute Libel under Illinois Law.</u>

Logically implicit in Defendants' statements that white American Jews are racists is the further assertion that their racism is manifest in their words (spoken or written) and their demonstrated actions. Racism that is never spoken, written, or acted upon in any way is like the proverbial tree that falls in the forest with no one to hear it. The individual Defendants here claim

3

to be among the most influential rabbis in America, with access to the Congress and the current presidential administration, but they do not pretend to be mind-readers. Thus, if the Court permits this case to proceed into discovery the individual Defendants will have to provide specific factual information and documents in support of their defamatory statements about American Jews. (Such discovery is important to develop a complete factual record in this case for likely future appeals.)

Similarly, to say that someone has "reaped" refers to a specific act. "Reaped" is the past tense of a transitive verb. During harvest, farmers reap wheat. The Grim Reaper harvests souls. Thus, the individual Defendants have made a fact-based accusation, that white American Jews have wrongfully reaped "rewards" through their racist acts, at the expense of African-Americans.

It is well-established, by a 2000 opinion of Judge Easterbrook, that the statement that someone is a "racist" is defamatory, and can be deemed a statement of fact rather than opinion, thus giving rise to an action for slander:

> [The staff attorney and the secretary/paralegal] offered their assertion that [the City Attorney] is a "racist"-- the only statement that plaintiffs characterize as raising an issue of public concern -- as a proposition of fact rather than of opinion, though it is principally the latter that the first amendment protects. [*Citations omitted, except Stevens v. Tillman,* 855 F.2d 304. 398-402 (7th Cir. 1988)]. . . . . [W]hether a given supervisor is a racist, or practices racial discrimination in the workplace, is a mundane issue of fact, litigated every day in federal court. **"[The City Attorney] is a "racist" is defamatory, and a person who makes an unsupported defamatory statement may be penalized** without offending the first amendment. Whether that penalty is delivered **in a slander action**… is immaterial to the Constitution."

*Taylor v. Carmouche*, 214 F.3d 788, 793-794 (7th Cir. 2000) (Emphasis supplied). Defendants' arguments about Judge Easterbrook's 12-year earlier 1988 opinion, *Stevens v. Tillman*, are somewhat vaguely presented, but are clearly intended to give the Court the impression that Judge Easterbrook held that the noun "racist" is always a matter of opinion and non-defamatory.

4

*Taylor v. Carmouche* utterly belies Defendants' argument that the noun "racist" is *ipso facto* non-defamatory.² But Defendants' brief pretended that *Taylor v. Carmouche* did not exist.

In Section III(B) of their argument (Mem. 5-6), Defendants appear to argue that *Stevens v. Tillman*, the sole case cited and quoted therein, with nearly a full-page block quote that straddles two pages, established some kind of blanket *per se* rule that the noun "racist" could never again be actionable after 1988 in a libel suit, based upon then-ubiquitous societal changes.

Although Defendants' argument preceding and following their large block quote is spartan, the point of law about which they sought to persuade the Court, is unmistakable. The heading of the section, bolded, states that "**Plaintiffs' Claims are Barred in their Entirety as Non-Defamatory**." Defendants go on in the first sentence of Section III(B) to assert that "Plaintiffs *argue* . . . ." (Emphasis supplied). Of course, until filing this Response to Defendants' motion to dismiss, Plaintiffs have never presented any argument to the Court. But even if one puts aside this false assertion as the result of poor word choice, and gives Defendants the benefit of the doubt that perhaps they meant to say "Plaintiffs allege," Plaintiffs have alleged no such argument.

However, Plaintiffs do now argue that the noun "racist," as used by Rabbi Pesner, taken not alone but in combination with his other inexorably intertwined words, constitutes a statement of fact, not of an opinion, just as the statement that the City Attorney "is a racist" in *Taylor* was adjudged by Judge Easterbrook to be a statement of fact, and a defamatory one at that. After the block quote, Defendants summed up their argument, albeit in a somewhat vague, roundabout way,

---

² It is troubling that Defendants did not cite *Taylor v. Carmouche* to the Court, since this 2000 Judge Easterbrook opinion appears to be directly adverse (within the meaning of Rule 3.3 (a)(2) of the Illinois Rules of Professional Conduct) to Defendants' position that the term "racist" is *ipso facto* non-defamatory, an argument they based upon a 1988 opinion from the self-same Seventh Circuit judge. Because *Taylor* cites *Stevens v. Tillman* in passing, Defendants should have encountered *Taylor* if and when they shephardized *Stevens v. Tillman.* If Defendants neglected to read *Taylor*, that is one thing. If they read *Taylor* and consciously decided not to cite the opinion to the Court, that is quite another.

5

that the noun "racist," *ipso facto* cannot be deemed a "false" statement as a matter of law. That is manifestly not the law in this Circuit.

Even putting aside *Taylor* and *Jones*, *Stevens v. Tillman* is clearly distinguishable from this case. The facts, milieu, context, and use of the word "racism" here are all distinguishable. Plaintiffs will not take up space and the Court's time with lengthy argument on this academic point, as the unedited original version of the full page block quotation in Defendants' memorandum, *sans* Defendants' chainsaw-like removal of 41 lines of Judge Easterbrook's text explaining his reasoning, speaks for itself as to the distinctions. Despite the great length of the block quote presented by Defendants, it is woefully inadequate and misleading, due to copious deletions. For the convenience of the Court, Plaintiffs have attached hereto (as Exhibit A) a copy of the WestLaw version of the block quote, with Defendants' deletions, one not even marked by an ellipse, restored and color-highlighted.³

But *Stevens v. Tillman*, the bedrock of Defendants' motion to dismiss, does not apply here because here, as in *Jones v. Heartland Employment Services, LLC, supra,* Plaintiffs did not slap back and could not have slapped back with a "racist" epithet of their own. The gist of this action, its very *raison d'etre*, is to challenge Defendants' false and defamatory factual assertions that white

---

³ The yellow-highlighted text in Exhibit A consists of the parts of the *Stevens v. Tillman* opinion whose deletion are reflected in the (i) "Citations Omitted" of the second paragraph of Defendants' block quote, (ii) the two ellipses that appear in the last three lines of the fourth paragraph, and (iii) the third ellipse that appears at the beginning of the fifth paragraph on page 6 of the opinion. Defendants omitted the green-highlighted text in Exhibit A from their block quote without placing an ellipse in its stead.

While all of the deletions result in a mis-leading block quote, one that could potentially induce error on the part of another judge, the omission of the eight lines of text reflected by the second ellipse of the fourth paragraph is particularly egregious. Judge Easterbrook's sentence after the ellipse states that "[m]eanings of this sort fit comfortably within the immunity for name-calling." When one reads the unexpurgated version of the opinion (Exh.A hereto) it is clear that by "meanings of this sort," Judge Easterbrook was referring to the "intermediate meanings" (so-called by the Judge) of "racist" as used in circumstances, wholly irrelevant to the present case, where the accused "racist" has acted in an inexplicably condescending manner, or has used stereotypes. The critical phrase, "intermediate meanings," appears in the first sentence, the topic sentence, of the highlighted eight sentences of text deleted by the Defendants.

American Jews are "racists" and more. Plaintiffs have no reason to believe that Rabbis Pesner and Jacobs have ever spoken, written, or acted upon, racist beliefs. Indeed, a "slap back" by Stang and Cohn of the "racist" epithet against two of the "most influential rabbis" in America would potentially have also been libelous and would have strangled this lawsuit in its cradle.

III.    Defendants' Statements Constitute Assertions of Fact, Not Opinions.

In Section II(D) of their memorandum, Defendants argue that the Pesner Article's statements cannot be defamatory *per se*, because they constitute "constitutionally protected expressions of *opinion*, rather than factual assertions." (Mem. 7). But the Northern District of Illinois opinion cited by Defendants sets forth legal factors that, when correctly applied to the allegations in this case, militate against a finding that Pesner's statements constitute opinion:

> The Illinois Supreme Court evaluates the opinion-versus-fact dichotomy by considering several factors: whether the statement has a precise and readily understood meaning, whether the statement is verifiable; and whether the statement has a literary or social context that shows it is a factual assertion rather than an opinion. [*Citing, Solaia Technology, LLC v. Specialty Publishing Company,* 221 Ill.2d 558, 581 (1997)]. Mixed expressions of opinion and fact are actionable. (Citation omitted).

*Board of Forensic Document Examiners, Inc. v. American Bar Association,* 287 F. Supp.3d 726, 736 (N.D. Ill. 2018), *aff'd*, 922 F.3d 827 (7th Cir. 2019). The Seventh Circuit amplified upon the specific criteria for the "social context" factor thusly: "Context is key, as it matters not only what was said, but who said it, where it was said, and the broader setting of the challenged statements." 922 F.2d at 832. Here, a close reading of Defendants' memorandum shows that they nowhere dispute (nor could they reasonably dispute) that the Pesner statements have a precise and readily understood meaning. After all, Pesner statements were not drunkenly muttered in a bar; they reflect careful, deliberate draftsmanship directed to an intended audience of the more than 400,000 people who comprise the *Chicago Tribune's* weekday readership. But for this lawsuit, Pesner

7

himself would surely declare that he took some pride of authorship in having crafted an article with precise and readily understood meanings.

Defendants also nowhere deny in their memorandum the verifiability of the statements in Pesner's article. Pesner's statements were specific as to the types of venues (synagogues, congregations, and homes, with no mention of health club locker rooms or ADL board meetings) in which he asserted that white American Jews had expressed or acted upon their purported racism. It is reasonable to assume that the individual defendants at least periodically, if not frequently, have made (until the recent pandemic) the rounds of Reform Jewish synagogues and congregations, and even private homes (such as the homes of any one of the rabbis or cantors serving the approximately 900 synagogues under the URJ umbrella.) Thus, the Pesner Article statements are indeed verifiable, by Pesner and other individuals that he should be able to identify, even if his recollection needs to be refreshed with URJ and Reform Synagogue membership lists.

It is true that Pesner did not identify a specific location address, or provide any racist quotes or describe any racist acts to support his general assertions of fact. But Pesner's statements clearly "insinuate[e] the existence of additional, undisclosed facts," *Black v. Wrigley*, 2017 WL 8186996 (N.D. Ill. 12/8/17), *8 (Kennelly, J.), a circumstance that further swings the needle over to "fact" rather than "opinion." Of course, Plaintiffs will seek that specific information through interrogatories, document requests, and the depositions of the individual Defendants and others, such as Al Sharpton. If the individual Defendants are unable to provide such substantiating information, that will go a long way to establishing that their statements were false.

Defendants also did not set out any argument about the "social context" of Pesner's statements. They made only the tepid argument that some of the headlines added to the Pesner Article, after its print publication, such as "Commentary" and "Op-Ed," somehow provide a "context [in which] no reasonable reader could have regarded any part of it as factual." (Mem. 8).

8

But those one-word headlines have little or no probative value, given that defamation *per se* can rest on a mixture of fact and opinion, as do most newspaper "commentaries" and "op-eds."

As stated above, the Seventh Circuit has held that in analyzing the "social context" factor, the Court must consider "**who said it**," here, the author of the allegedly libelous statements, Rabbi Jonah Dov Pesner. Pesner is not some obscure, anonymous internet troll, nor is he a drunk shouting Jew-hating imprecations on a public sidewalk. No one, including the Plaintiffs here, would hale such pathetic 'low-lifes' into a federal court. Unfortunately, the individual Defendants here are men who enjoy the highest positions and prestige in the URJ, as the organization's two most senior officers. That is shown by Defendant Pesner's professional profile appended to his Article, as republished on the URJ's website. (Exh. C to Defendants' Memorandum, third page). Rabbi Pesner's profile states that he "represents the Reform Movement to Congress and the [Trump] administration," and further states that Pesner has been "[n]amed one of the **most influential rabbis in America** . . . ." (Emphasis supplied).

Thus, it is reasonable to assume, that Pesner (and his superior, Jacobs) enjoys great credibility in his public pronouncements, among Jews and Gentiles alike. As Pesner obviously has not seen fit to retract or apologize for his libel against white American Jewry, and the *Chicago Tribune*, the first publisher of Pesner's libels, has repeatedly refused to permit Plaintiffs to mitigate their damages, even with a paid advertisement (Complaint, ¶66, p. 17 and ¶74, p. 19), up to the present day, Pesner's libels would stand not only as factual assertions, but <u>established</u> <u>facts</u> in the minds of the American public, wholly un-contradicted and unchallenged, but for this libel action.

To gauge the full impact of the "social context" here, it is useful to draw a "parallel universe" type analogy. Imagine if such calculated written libels were promulgated by another religious leader against all the members of his own faith, themselves an oft-hated and historically mistreated minority in their own country, an unfortunate part of the American experience for Jews

in this country. Suppose, for example, that the Most Rev. Diarmuid Martin, the Roman Catholic Archbishop of Dublin and Primate of Ireland, published an article in the *Belfast Telegraph* or the United Kingdom's # 3 newspaper, the *Daily Mail*, accusing all Catholics in Northern Ireland, without exception, of sectarian hatred (like racism, necessarily manifested by words and/or actions) in their churches, congregations, and homes, against the entire Protestant population of Northern Ireland.[4] Suppose further that the Archbishop also accused Northern Irish Catholics of 'reaping the rewards of sectarian hatred,' through 'Catholic privilege, in how their grandparents came to Ulster, the places where Catholics were allowed to live and work, and special Catholic access to education and financial capital.'

Such a hypothetical denunciation by an acknowledged Roman Catholic religious leader against his own people would be shocking almost beyond words (but no more shocking than Rabbi Pesner's denunciation of American Jewry in the pages of the leading newspaper of America's third largest city). Such a group libel would doubtlessly trigger emergency meetings in Vatican City, Dublin, and elsewhere. These hypothetical libels would enjoy far greater credibility when written by Archbishop Martin than they would if written by Ian Paisley, the Protestant inciter of the

---

[4] Undersigned counsel is an avid student of Irish history, particularly the Easter Rising of 1916 (in part because of its parallels to the later Jewish Insurgency against the British occupation of Mandatory Palestine). During a vacation in the Emerald Isle in October 2005, counsel examined bullet holes in the General Post Office in Dublin, and paid a visit and his respects to the jail cells of the rebels in Kilmainham Gaol, as well as the nearby site of their wrongful executions, and read the originals of their moving farewell letters to their families. Counsel also spent two days and nights in Belfast and three days and nights in Derry (a/k/a Londonderry). In Derry, counsel and his wife were permitted an impromptu 70-minute meeting in chambers with a Northern Irish judge, the Hon. Judge Corinne Philpott QC (See professional card, Exh. B hereto), to discuss Her Honor's immediately preceding sentencing of a convicted violent criminal, as well as life and law generally in Chicago and Derry. From Judge Philpott and others, counsel learned that although Ulster's sectarian fratricide had abated since the 1990's, it had by no means ended. Undersigned counsel corresponded by email with Judge Philpott occasionally (Christmas-time) until her premature death on June 16, 2016 (Obituary at Exh. B) from the exact same dreaded disease that had claimed undersigned counsel's wife six-and-one half years earlier. During the memorable meeting in chambers, Judge Philpott modestly never intimated that she considered herself a "trailblazer," as headlined in her obituary, which regrettably omitted any mention of Judge Philpott's keen wit.

10

murderous "Troubles" that afflicted Northern Ireland for at least three decades beginning in the 1960's. (The Most Rev. Martin surely never embraced Ian Paisley at all, let alone with the *joi de vivre* shown by the individual Defendants here when photographed with their friend and ally, Al Sharpton, unrepentant inciter of the 1991 Crown Heights Pogrom. (Complaint, ¶¶ 7-9, p. 3; Exh. B to Complaint). The "who said it" criterion of the "social context" factor mandated by the Seventh Circuit, among the other criteria and factors that favor the Plaintiffs here, warrants the Court finding that the Pesner Article set forth actionable, defamatory statements of fact.

IV. <u>Labeling a Lawyer a "Racist" Constitutes Defamation *Per Se.*</u>

Defendants blithely argue that "Rabbi Pesner's use of the word "racist" in his opinion editorial [*so-called only by Defendants*] is not libel *per se* . . . ." (Mem. 8, bottom). Of course, as alleged in the complaint, Pesner's libelous statements consisted of more than just the stand-alone word "racist," but identified the locations of purported racism and racist exploitation as including 'workplaces,' – "the places [white Jews] were allowed to . . . work." (Complaint, ¶ 1, p. 1).

It is beyond reasonable debate that labeling a lawyer, like the Plaintiffs here, as a "racist" constitutes not (i) simple libel, requiring the pleading of special damages (which Plaintiffs have adequately done in paragraphs 50, 54, 80, and 81 of the complaint) and proof of damages (as to whose quantification "broad latitude is allowed,' *Phoenix Bond & Indem. Co. v. Bridge*, 911 F. Supp.2d 661, 675 (N.D. Ill. 2012) (Kennelly, J.)), <u>but</u> (ii) libel *per se*, <u>dispensing altogether with the need for any pleading and proof of special damages whatsoever</u>.

This *per se* point is established beyond peradventure by the tragic 1989 tale of a Chicago lawyer, Harry O'Kane, which is part of the collective memory of Chicago lawyers, at least that of the "Boomer" generation. The Court may take judicial notice of the incident and refresh its recollection, if any refreshment is needed, through the four related documents attached as Exhibit C, hereto, consisting of: a 1/31/89 article from the *Chicago Tribune*, a 2/3/89 article from the *New*

*York Times*, five letters to the editor published in the August 1989 edition of the *ABA Journal* (the first of which was written by O'Kane's son in defense of his father), and O'Kane's obituary.

The obituary states that O'Kane's professional career began at the law firm of Baker & McKenzie, where he was a partner until at least 1989, and ended his career at a second law firm, Dowd & Dowd. The *New York Times* article reports in its third paragraph that the chairman of Baker & McKenzie's executive committee publicly proclaimed that the law firm was "outraged" over O'Kane's verbal utterances during his interview of a female African-American first-year University of Chicago law student, and considered as "just" the law school's ensuing one-year ban against anyone from the firm interviewing law students on campus. The *Times* further reported that O'Kane took a "voluntary" leave of absence from the firm while his partners deliberated whether action should be taken against him.

In denouncing O'Kane, his law firm did not conclude that O'Kane was a racist in his heart, or even that he harbored any racist intentions in making utterances, purportedly intended as a novel (and inadvisable) "stress test" for the law student interviewee, that by any objective measure, <u>taken alone</u>, would clearly support an inference of racism.

The 1989 O'Kane incident did not, as far as counsel has been able to determine, result in any litigation or ARDC disciplinary action. Far from taking any discriminatory adverse employment action against the interviewee, O'Kane had recommended that the firm hire her. O'Kane publicly issued a sincere letter of apology (unlike the Defendants here, who have not expressed the least bit of contrition or regret over the indisputably false and defamatory content of the Pesner Article, even putting aside the fact *versus* opinion issue). The "*most influential* rabbis in America" evidently believe they are also <u>infallible</u>. Thus, they believe they do not need to answer to anyone, apparently including even to the URJ's Board of Directors.

The tragic travails of Harry O'Kane amply demonstrate that a lawyer falsely accused of being a "racist," which necessarily entails racist utterances or writings, and/or racist acts, suffers great, potentially fatal, harm to his "reputation, "lower[ing] the person in the eyes of the community or deter[ring] the community from associating with her or him." *Solaia Technology,LLC v. Specialty Pub. Co.*, 221 Ill.2d 558, 579 (2006). The libel here clearly meets the criteria of both the third and fourth categories of libel *per se* under Illinois law. *Id.* at 579-580.

V.  <u>Defendants' Libelous Statements Are Not Protected by the First Amendment</u>.

In deciding the Defendants' motion to dismiss, the Court must consider not only the foregoing Illinois state law issues, but a fundamental constitutional question as to which it is likely the United States Supreme Court will grant a petition for writ of *certiorari* filed by whichever side in this case loses the inevitable Seventh Circuit appeal. The constitutional question arises from Defendants' argument that "the statements at issue in Plaintiffs' Complaint cannot be the premise of defamation *per se* claims [because] the statements are constitutionally protected expressions of opinion . . . ," and that "[t]he First Amendment protects the expression of opinions . . . [h]owever pernicious an opinion may seem . . . ." (Mem. 7-8, first paragraph of Section III(D)).

Thus, the Court must decide whether Plaintiff's libel *per se* claim, predicated upon indisputably pernicious, as well as false and defamatory, statements by the "most influential rabbis in America" against the Plaintiffs and the rest of white American Jewry are barred by the First Amendment.

Plaintiffs regret the need to inform the Court that Defendants' counsel, in presenting the Defendants' First Amendment defense, have again disregarded their Rule 3.3(a)(2) duty to present directly adverse case law. Defendants' memorandum deliberately ignores the 900 pound "legal" gorilla (perhaps more aptly described as a constitutional King Kong) that was in the room with

13

them[5] when they wrote their memorandum -- *Beauharnais v. Illinois*, 343 U.S. 250 (1952), *Beauharnais* affirmed the enforceability of Illinois criminal statutes punishing group libel, enacted as a way "to curb false or malicious defamation of racial and religious groups, made in public places and by means calculated to have a powerful emotional impact on those to whom it was presented . . .." *Id.* at 261. The critical public policy concerns just quoted fit <u>this</u> case 'to a T.'

*Beauharnais* not only precludes Defendants' First Amendment defense, but offers strong support for the existence of Plaintiffs' cause of action, a paradigmatic form transported from the legal ether to Earth and this Court, and given tangible existence in the complaint, as the sole means to redress Defendants' unprecedented, hateful libels against the Jewish people (the most persecuted minority in world history). If the First Amendment does not immunize the libelers, like the Defendants here, of a religious group from criminal prosecution and ***going to jail***, then *a fortiori*, the First Amendment does not immunize them from civil liability for the ***mere payment of damages*** (actually by their insurance company) because of the self-same group libel.

*Beauharnais* is still good law. Indeed, *Beauharnais* is the centerpiece of a seminal article published in *Atlantic Magazine* on June 16, 2019, entitled "An Abandoned Weapon in the Fight Against Hate Speech," by University of Virginia Jewish History Professor James Loeffler. https://www.theatlantic.com/ideas/archive/2019/06/lost-history-jews-and-civil-rights/590929/ .

---

[5] Beyond a reasonable doubt, Defendants knew of the *Beauharnais* opinion and of Plaintiffs' intention to rely upon it as a direct counterpoint to Defendants' First Amendment defense well before filing their memorandum. Conclusive evidence of Defendants' knowledge is contained in the *Chicago Daily Law Bulletin* article (Defendants' Mem. Exhibit D). Defendants cited the article as containing evidence of an out-of-court admission by Plaintiffs' counsel about the numerological significance of the damage amounts alleged in the complaint, contained in a single paragraph in the middle of the second page of Defendants' Exhibit D; however, immediately below that paragraph are <u>five</u> paragraphs discussing *Beauharnais* and its implications for this case, which Defendants' counsel surely read and understood before attaching the entire article to his memorandum. While Plaintiffs are not accusing Defendants of willfully "sand-bagging" the Court, they reserve their right to seek leave to file a sur-reply memorandum if Defendants present argument about *Beauharnais* in their reply memorandum that could and should have been presented in their opening memorandum.

*Beauharnais* is abandoned no more, but likely will be revisited by its Supreme Court parents.

VI. <u>Plaintiffs Have Standing to Bring This Libel Action</u>

Section III(C) of Defendants' argument (Mem.6-7) essentially challenges Plaintiffs' standing to pursue this action individually, on the purported basis that Stang and Cohn were not identified by name in the Pesner Article as first published.[6] All of the cases cited therein are wholly distinguishable from this case. In making the argument, Defendants have overlooked that their libel was published not only in the *Chicago Tribune's* print and electronic pages in mid-December, 2019, but has been <u>re-published every day since, to the day of this filing</u>, on the URJ website. (Complaint, ¶5; Defendants' Mem. 8, Exh. C). Plaintiffs' names and identities as white American Jews (and lawyers) to whom the Defendants' libel is directed, and necessarily imputed, has been a matter of public record since early February 2020, as a result of the filing of the complaint and the publication of the *Chicago Daily Law Bulletin* article, itself republished by Defendants.

Plaintiffs cannot be accused, at least not fairly, of having attempted to use the filing of their complaint to create standing. Plaintiffs, both 67 years old, tried to mitigate their damages, and have no desire to spend the waning years of their legal careers in the glare of publicity that has already brought them private obloquy. But the intransigent Defendants leave them no choice; they continue to re-publish their libels against the Plaintiffs every day, and have never publicly (nor privately) announced that Plaintiffs are excepted from the scope of Defendants' continuous libels.

However, in the event the Court concludes that Plaintiffs somehow lack standing to sue over the libels that Defendants have perpetrated against them, Plaintiffs respectfully request 30 days' leave to file an amended complaint adding a class action count to this case.

---

[6] Stang's mass-murdered grand-parents and 30 other family members were never identified by name in the German Nazi newspapers *Volkischer Beobachter* (National Observer) and *Der Sturmer* (The Striker), whose libels against the Jews of Europe, including Jews' special "access to capital," were a key component of the demonizing propaganda that enabled and led inexorably to the murder of Six Million Jews.

          MARK STANG and STUART COHN

          By      s/ *Mark A. Stang*
                  One of Their Attorneys

Mark A. Stang
Stang-Law Firm
584 Hyacinth Place
Highland Park, Illinois 60035
(847) 432-2073
mstang@stang-law.com

Farva Jafri
Jafri Law Firm
200 W. Hubbard Street
Suite 200
Chicago, Illinois 60654
(800) 593-7491
farva@jafrilawfirm.com

<u>CERTIFICATE OF SERVICE</u>

I, Mark A. Stang, an attorney, certify that I served the foregoing Response to Defendants' Rule 12(b)(6) motion to dismiss on Defendants on April 27, 2020 by CM/ECF transmission to Mitchell Frazen, their attorney of record.

By_____<u>*Mark A. Stang*</u>_____