IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARK STANG and STUART COHN, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | No. 20 C 757 |
| | ) | |
| v. | ) | |
| | ) | |
| UNION FOR REFORM JUDAISM, | ) | Judge Matthew F. Kennelly |
| JONAH DOV PESNER, and | ) | |
| RICHARD "RICK" JACOBS, | ) | |
| | ) | |
| Defendants. | ) | |

PLAINTIFFS' MOTION TO WITHDRAW APPEARANCE OF COUNSEL FARVA JAFRI
AND
FOR PRESENTMENT OF STATUS REPORT CONCERNING PLAINTIFFS' SOLE
REMAINING COUNSEL AND CHICAGO STAND-UP COMEDIAN MARK A. STANG

Plaintiffs, Mark A. Stang ("Stang") and Stuart A. Cohn ("Cohn"), by their attorney, Mark

A. Stang, move this honorable Court for (i) leave to withdraw the amended appearance (Dkt. 15)

of their additional counsel, Farva Jafri, *instanter*, and (ii) to present *instanter* this status report

concerning plaintiff's sole remaining counsel and stand-up comedian Mark A Stang (initially

identified as a "stand-up comedian" to the Court in this action not by Stang himself, but by

Defendants, as more particularly set forth below).  In support, Stang and Cohn state as follows:

1.      On or about April, 28, 2020, Farva Jafri, then an attorney admitted to the State Bar

of The New York and the United States District Court for the Northern District of Illinois, became

associated with the Stang-Law Firm, a sole proprietorship owned by Stang.  Jafri filed her amended

appearance (Dkt. 15) as additional plaintiffs' counsel.

2.      Prior to filing her appearance, Jafri had assisted Stang in preparing plaintiffs'

memorandum in opposition to defendants' Rule 12(b)(6) motion to dismiss the complaint (Dkt.

13).  Jafri rendered invaluable assistance both in legal research and carefully cite-checking and

quote-checking defendants' brief. Jafri's youthful enthusiasm also promoted an *esprit de corps* that will be missed.

3.      Due to the ongoing pandemic/lockdown, Jafri, a model in filial devotion that all young women would do well to emulate, is attending to her elderly father at his residence in New York state. Further, Jafri has shifted the locus of her future intended law practice from Chicago to New York City. Thus, it no longer makes sense, and indeed would be unfair, to burden Jafri with the continuing responsibilities of serving as second chair trial counsel in this action.

4.      Of course, Jafri's withdrawal will leave Mark Stang as the sole attorney for himself and his co-plaintiff, Stuart Cohn. As noted above, Stang is a sole practitioner. In fact, Stang practices law in a home office located in the finished half-basement of his residence, a small ca. 1750 s.f. 3-BR, 1 ½ ba. Split level home in Highland Park's affordable Highlands neighborhood. Stang's home is one of the few on the North Shore that lacks automatic garage doors, but is instead equipped with manual, California-style tilt-up garage doors.[1]

5.      Eventually, as repeatedly urged upon Stang by many of his clients and colleagues, Stang will relocate his law offices from his finished half-basement to a van down by the river (*i.e.* the Des Plaines River, as vans by the Chicago River are too pricey even in the pandemic/lockdown.)

6.      Stang is also limited by the fact that not only does he not have a full-time legal secretary, he does not have a part-time legal secretary, nor any other staffers. Instead, Stang utilizes the services of an on-call remote former legal secretary, mostly for Microsoft Word formatting

---

[1] Upon moving to Highland Park, Stang's children insisted that the manual doors be replaced with automatic garage doors. Stang demurred, telling his children, "I am not going to let you grow up spoilt like other Highland Park kids. *You* are going to be the family's automatic garage door openers." Neither of Stang's children has spoken to him since graduating from college and moving out-of-state, to Washington, D.C. and Los Angeles, respectively.

problems and emergencies that are beyond Stang's competence.  For most of his word-processing needs, Stang relies upon a 2013 version of Dragon dictation doftware, with a headset (i) that was too small for Stang's enormous pumpkin-like head, (ii) broke the first week, and (iii) is now held together by copious amounts of scotch tape.  Finally, word-processing at Stang-Law Office is highly dependent upon Stang's ability to decipher the incomprehensible instructions contained within his well-thumbed and post-it flagged 390-page copy of "Microsoft Word 2010 for Dummies."

7.      Stang has spent many an unhappy wee hour poring over this sacred text, which might as well be written in ancient cuneiform (concededly, perhaps the "ancient" is superfluous as there is no such thing as "modern" cuneiform) because Stang's computer has installed a later version of Word, *i.e.*, Word 2013, and the "Dummies" book and the Word program might as well be the proverbial "apples and oranges."  Q.  Why not simply purchase "Microsoft Word 2013 for Dummies," one might well ask?  A. It's not in the Stang-Law Office library budget.  Moreover, the firm librarian (Stang) is still amortizing his improvident 2015 purchase of the 2010 book at a bargain price, a virtual "steal."

8.      But as if the faltering Stang-Law operations were not enough to give any federal judge pause about the ability (but not the determination and true grit) of a single beleaguered Stang to maintain the offense against defendants counsel, the prodigiously deep and wide bench of the law firm of Litchfield Cavo, and its phalanx of 22 law offices serving 35 states, with 72 attorneys in the Chicago office alone https://www.litchfieldcavo.com/about-us/**,** The defense is spear-headed by equity partner Mitchell Dale Frazen, like Stang, a 1980 law school graduate. However, Frazen graduated from the University of Michigan Law School, Order of the Coif. https://www.litchfieldcavo.com/attorneys/mitchell-h-frazen/ (Frazen's webpage inexplicably, modestly does not reveal whether he was *magna cum laude*, but he likely was.)

3

9.      Stang, on the other hand, graduated from the University of Chicago Law School, Order of the UnCoiffed and *thank you laude.* Stang got into U of C Law by the skin of this teeth and he got out of U of C Law by the skin of his teeth. In fact, Stang's teeth have been completely skinless since his graduation in 1980. Over the past 40 years Stang has had to pay large sums for teeth skin replacement therapy, not covered by various law firms' group health insurance, Obamacare, nor Medicare. It has been a raw deal, and Stang has been forced to reduce his alumni contributions to the University of Chicago Law School accordingly. He will not give his eyeteeth.

10.     Stang is clearly out-gunned, both in terms of his poor past law school academic performance and scant law firm resources.  One might ask, isn't the fight all but over? Would it not make more sense for Stang to just look in the mirror, do a reality check of his sleepless, bloodshot eyes, and then concede defeat?  Why foolishly choose death before dishonor?  Aren't these enough rhetorical questions for one paragraph of a largely contrived motion?  But if Stang cannot go home with his head held high, that is still better than having his head handed to him by an equity partner in a 22-city law firm.  Sometimes, the better part of valor is to just cut and run and hope nobody notices.  Hard to do in a lawsuit that is public record and already being covered by the eagle-eyed editor of the *Chicago Daily Law Bulletin* and numerous other publications waiting in the wings.

11.     But wait, what is that sound in the distance?  Thundering hoofbeats and the clarion call of bugles.  There are several guidons in the distance, all carrying a banner with the same letters, MB.  Mayer Brown is on the way to the rescue!  (See 7/22/20 email from Mayer Brown litigation partner Lee Rubin to Mark Stang, Exhibit A hereto).  Stang is an army of one no more.  Hundreds of valiant, competent cavalry men and cavalry women are on their way to join in the battle.  All that remains is for the cavalry's top leaders to decide whether or they wish to wrap themselves in the glory of national publicity that will forever enshrine them as great men and women who rose

4

to the occasion of litigating an historic case, that some are already calling "The Libel Case of the Century," while others quibble and say, "No, it should be century-specific, Call it the "Libel Case of the *Twenty-First* Century!", While the parties of the first part rejoin, "Why does it need to be century-specific, it's only 2020, nobody's going to get confused until 2101 about which century it's in!" Finally, some new party enters into the naming debate and declares, "you guys are all wet! You don't need the libel qualifier! It's the ***federal* court case of the century!"**

12. All humor aside, Len Rubin, the author of the 7/22/20 email attached as Exhibit A, and Mark Stang are co-counsel in another action pending before this same court, entitled *Mizrachi v. Ordower,* Case No. 17 C 8036, currently set to commence jury trial on November 16, 2020 (Dkt.. 202) Stang and Mayer Brown attorneys have worked together well on that case and Stang looks forward to working well together with his friends and colleagues at Mayer Brown on *Stang v. URJ* as well. If not, Stang anticipates that other Chicago law firms with adequate resources to litigate this matter to the full extent warranted, given the important nature of the issues at stake, including the constitutional law questions, will offer their *pro bono* services. In the unlikely event that no other firm wishes to join, Stang is more than willing to carry the battle on his own.

<u>Defendants' Partial Disclosure to the Court of Stang's Background as a Humor Writer</u>

13. It is true that Stang was humor editor of his college newspaper, as truthfully stated by defendants their "Defendants' Reply in Support of Their Rule 12(b)(6) Motion to Dismiss Plaintiffs' Complaint," which states in pertinent part that "Plaintiffs' colorful name-calling . . . can perhaps be attributed to [Stang's] background as a humor editor of his college newspaper and is more recent work as a stand-up comedian in Chicago comedy venues." (Dkt. 16, pp. 1-2, n. 2). In his short-lived career (1971-1972) as humor editor of the *Emory Wheel,* succeeding in that position to famed Miami Herald columnist and novelist Carl Hiassen, Stang published satirical articles such

5

as a front-page "McGovern Wins!" special election issue and a Playboy Magazine of parody entitled *A Wheel Interview with God."*

14.     The latter cutting-edge interview, not authorized by the editor-in-chief of the *Wheel,* and considered somewhat (well, highly) offensive to a substantial proportion (well, 90%) of the Wheel's readership (even the agnostics hedged their bets and joined the angry "Lynch Stang!" mob) ended published satire and the First Amendment at the "Harvard of the South," (well, one of them anyway, the other two being Vanderbilt and Duke), until the spring of 1975, when Stang, having nothing better to do during his last quarter at Emory, published eight weekly highly offensive satirical newsletters with his own masthead, "*The Emory Spitoon*" using a high-quality form of mimeograph called "quick-print" in the printing room in the basement of the Administration Building at Emory, furtively running each issue a few floors below the offices of the Deans of Admission, Student Activities, and Students, respectively.

15.     Stang's duty of candor towards the tribunal requires him to make additional disclosures about his humor activities, so as to avoid leaving Defendants' incomplete disclosure of his numerous works un-supplemented and thus misleading to the Court. For the sake of brevity, Stang will not elaborate, but merely attaches hereto as Group Exhibit B, 1976 correspondence to Stang from Saul Bellow, Alan Alda, the Chicago office of the William Morris Agency. . If any further elaboration is needed or desired by the Court, Stang will provide it orally at hearing or by way of a written report, as directed.

16.     By 1977, Stang managed to curb his enthusiasm for a career in humor-writing, and to pursue a life in the law instead. However, in early December, 2019, challenged by his significant other to try his hand (or, to be more precise, his big mouth) at stand-up comedy, Stang attempted his first open mic for a four minute performance at the Logan Theater in Chicago on December 16, 2019.   https://www.thelogantheatre.com/content/Open+Mic+Comedy Then, addicted to the

stand-up life by the chuckle and deafening sound of one hand clapping that he had elicited at his first performance, Stang performed a second open mic a week later on December 23, 2019.

17.     Stang's comedy career gained traction and momentum with his second open mic. This time, someone actually laughed, once, but in all candor, it might have been a wheezy winter cough. Since this is a filed court paper, subject to Rule 11 sanctions, Stang must hereby admit that it was probably a cough, not really a laugh at all. But somebody actually thought that Stang was funny enough the second time to put their hands together, so there deftly was the sound of two hands clapping not just one, to Stang's delight. Unfortunately, Stang's now-former significant other had her cell phone set on still photo, rather than video, so Stang's second open mic performance is lost to history, not just to Chicago comedy history, but to the history of Western civilization. (Small wonder then that that men, not women, *think* they rule the world, as well they should.)

18.     Jaded by the tedious, dark, underworld of Chicago open mics, an amateur event requiring long waits in a queue of 15 other comedians, not unlike standing on line to file court papers at the Daley Center, Stang resolved to launch his professional career. Accordingly, Stang cut a deal with a local comedy promoter to open for a set of four professional comedians the day after Christmas at Chicago's neighborhood-famed Burlington Bar, 3425 W. Fullerton. Stang received his first professional remuneration as a stand-up comedian, $3.50 in drink tickets, the bitcoin currency of the Chicago comedy trade.

19.     Because Stang has never been able to consumer more than ¾ of one light beer without insulting total strangers and breaching the peace, due to pathological intoxication related to his low blood pressure, he asked the bartenders whether he could use his drink tickets to buy some bottled water. The bartenders snickered knowingly to each other as though Stang were some ind of hopelessly naïve eight-year-old New Jersey chicken farm boy (which Stang actually once

was (ca. 1952-1961), and pretty much still is at the core of his being) and said, "Sure thing, pardner, you can buy a $3.50 bottle of water from us any old time."

20. The Court may, if it desires, view Stang's disastrous, career-ending stand-up comedy performances at the Logan Theater and the Burton Bar by going to You Tube and entering "Boomer Mark Stang" in the search field, which will pull up both clips. In the same spirit of candor that has prompted the foregoing additional disclosures to Defendants' commendable forthrightness in footnote 2 of their reply brief (but not to Defendants' baseless and oddly internally inconsistent complaint about "Plaintiff's colorful name-calling" (isn't "colorful" like "flamboyant," a *positive*, and "name-calling" like "tattle-taling," a *negative*?) Stang must caution the Court, in the interest of judicial economy, that watching the clips, though vaguely amusing, might be a waste of 5:41 minutes and 8:18 minutes respectively. That's just one second short of 14 minutes down the tube. But of course the Court would be the best judge of that.

> Frazen *Amost* Belly-Bumps Stang Clear Out of the Sumo Ring in their Epic Comedy Battle Over the *Beauharnais/King Kong* Metaphor; At the Last Minute Frazen Steps on His Own Rhetorical Land Mine and King Kong Emerges Unscathed for his Sojourn in the District Court   through Trial and once the Case (Movie) is a Wrap, Showing at Higher Courts.

21. As Stang began to read the last paragraph at the bottom of page 15 of Defendants' reply brief, he had a churning, sickening, sinking feeling in his stomach. Stang felt, momentarily, that his worthy opponent, Mitch Frazen, had made a monkey out of Stang with Stang's own King Kong metaphor. Stang initially thought as of plaintiffs' memorandum in response, that he was the showcase headliner, with the Court and even Frazen himself in the audience (sitting apart, of course) but now Stang had been completely upstaged, pinned to the ropes and relegated to the also-ran role of second banana. The reply brief having been filed, Stang had even less to say about the matter than the famous chimp Chatter. This was no Thrilla in Manila, Stang had clearly been Out-Magilla'd.

22.     So what to do?  Nothing absolutely nothing.  Stang and Frazen had implicitly acknowledged in their briefing that this is a case of constitutional magnitude, and that the same giant Movie Monkey, King Kong *Beuharnais*, is involved.  But Frazen had successfully sowed some confusion by placing Mighty Kong at the scene of his final demise, at the end of his life, in the Streets of New York, far away from Kong's native habitat, Skull Island. Stang, in contrast, had envisioned Kong closer in time and place to that proverbial, younger 900-pound gorilla.

23.     Could it be that Frazen, indisputably a brighter law school academic and performer than Stang, was also a greater humorist?  Was that the reason for Frazen's seemingly gratuitous footnote 2 about Stang's long ago a career as humor editor of his college newspaper, and his more recent "work as a stand-up comedian in Chicago comedy venues." Was Frazen's game to seek to taunt Stang on pages one and two of defendants' reply brief, as Frazen knew he would be moving in for the King Kong Kill on page 15?  Stang was burning alive in comedy and legal profession hell until this very morning, when he put aside his self-recrimination over having been bested by his adversary, Frazen, in their epic comic battle over the King Kong metaphor, a metaphor invented by Stang, but adapted and used to seemingly fatal effect by Frazen.

24.     But then Stang re-read a very odd turn of phrase in the very last sentence of the last paragraph on page 15 of the Reply brief: "Plaintiffs' suggestion that the high court would use this action to revive that **68-year old corpse** (Memo. Opp. at 15) is colossal hubris."  "Whoa!" Stang thought to himself aloud quietly. "I misread that seductive phrase the first time, as "corpse of a 68-year old," which arguably describes me after a tennis match in this recent hot weather.  But a corpse that has been lying around for 68 years is a very different corpse."  Suddenly it hit Stang. Frazen was arguing, in effect, that *Beauharnais* became a corpse way back in 1952, at the very moment that the case had been decided by the Supreme Court.  How could that be?  For King Kong to be a corpse his entire life he would have to have been a stillborn!

9

25.     The "68-year old corpse" is the rhetorical land mine that defendants' planted and then stepped on. *Beauharnais* did not <u>die</u> and begin to decompose in 1952. *Beauharnais* was <u>born</u> in 1952. One can argue that *Beauharnais* has gone through periods of dormancy, just like plaintiffs Stang and Cohn, who like *Beauharnais* were also born in 1952 and who also have not been "68-year-old corpses" since that year. Indeed, Prof. Loeffler described *Beauharnais* as an "abandoned weapon" to be picked up and fired with effect. (Plaintiffs' memorandum in opposition to Rule 12(b)(6) motion to dismiss, Dkt. 13, p. 14). Most importantly, <u>the United States Supreme Court has never overruled *Beauharnais*</u>.

26.     *Beauharnais* is still alive and has always been alive since it was handed down in 1952. As our democracy, once an example to the world, is being replaced by destructive "group identity" politics, and racial violence and incitement reaches new heights, why should individuals be left remedlyless for vile libels directed against them, as indisputable members of a a vulnerable group under relentless attack that are intended to leave them just as injured or victimized as if their names were uttered?

27.     This Court certainly has the authority to analyze and discuss *Beauharnais* and suggest to the Seventh Circuit Court of Appeals and the United States Supreme Court what should be done with the case and whether the holding and underlying public policies of *Beauharnais,* including preventing incitement of group hatred and violence against minority groups, such as African-Americans and Jews, are still important societal goals.

28.     The Court has a well-deserved reputation for intelligence, fairness, practicality, and swift administration of justice in handling the cases before it. The case certainly will be newsworthy, as already recognized by the *Chicago Daily Law Bulletin* in covering this case from the moment it was filed. The case will be inherently controversial and spur widespread robust public debate, in the run-up to the November 3, 2020 election.

29.     Plaintiffs' counsel admits that for several weeks, after feeling he had been hoisted by the petard of his King Kong metaphor, he was in the humor-writing dumps.  All Chicago stand-up comedy venues have been closed for many months, with no prospect of opening in the foreseeable future.  At 67 (but not a 67-year old corpse) Stang is not getting any younger, it seems like every day the news gets worse and worse, and the American people are losing their patience and their senses of humor.  Political correctness has made the transition to social and political repression, and a "cancellation culture" that has run riot..  The relentless peer pressure for social conformity is worse now than it ever was in the 1950s.  The 1960's are looking better than ever before.

30.     Nevertheless, Stang would offer a bit of doggerel, because Stang is a man, and all men are dogs, ergo Stang is a dog, and writes doggerel (though in the semi-darkness of his finished half-basement, Stang has an essay in progress entitled "Dogs are Actually Woman's, Not Man's, Best Friend.")  Here goes:

> *To win a case before Judge Kennelly,*
> *It helps to have fire in your belly,*
> *And knees made of steel, not jelly.*

Perhaps Stang should keep his day job.  The Court can be the Judge, and Stang hereby waives any appeal, as Stang has complete confidence in the Court's sense of humor, as reflected in paragraphs 5 through 31 of this motion, for which defendants' counsel opened the door wide with footnote 2 of his reply brief in support of his motion to dismiss.

31.     Of course, the real reason that Frazen wrote about Stang's humor-writing side, all the way back to college and more recently, was that he thought it would make Judge Kennelly think less of Stang, that Stang somehow lacks *gravitas*. But that was a miscalculation on Frazen's part, because anyone who has spent much time with Judge Kennelly in court or chambers, knows

that His Honor has an excellent, wry sense of humor, and for any lawyer to insinuate otherwise in

a court paper that is a matter of public record is no laughing matter.

*There once was a lawyer named Frazen . . .*

Undersigned counsel will stifle himself now and save the limerick for the FPTO.

MARK STANG and STUART COHN


By_____s/ *Mark A. Stang*_____
            Their Attorney


Mark A. Stang
Stang-Law Firm
584 Hyacinth Place
Highland Park, Illinois  60035
(847) 432-2073
mstang@stang-law.com

12

CERTIFICATE OF SERVICE

I, Mark A. Stang, an attorney and professional Chicago stand-up comedian (on hiatus due to the pandemic/lockdown closure of all Chicago stand-up comedy venues), certify that I served the foregoing motion to withdraw Farva Jafri as plaintiff's counsel and for presentment of status report on July 28, 2020 on defendants by CM/ECF transmission to Mitchell Frazen, their attorney of record.

By_____*Mark A. Stang*_____